## MACON & BIRMINGHAM RAILROAD CO. *v.* REVIS.

As has heretofore been ruled by this court in a number of cases, while the law . raises against a railway company a presumption of negligence whenever the fact is made to appear that live stock was killed by the running of its cars, yet this presumption can not withstand positive and uncontradicted evidence that the company's employees exercised ordinary diligence, both as regards maintaining a lookout for stock and endeavoring to avoid injury to the same when discovered ; and relevant testimony in behalf of the company on the part of its servants can not, if they be unimpeached, arbitrarily be disregarded by court or jury, upon the assumption that it is not,.in point of fact, in accord with the truth.    The facts of the present case bring it within these rulings, and the court below erred in not granting the defendant company a new trial.

Submitted November 21, 1903.—Decided January 12, 1904.

Action for damages.    Before W. T. Tuggle, judge pro hac vice. City court of LaGrange.    June 19, 1903.

*Longley & Longley*, for plaintiff in error.

TURNER, J.    The plaintiff below, in support of his contention that the defendant railway company was liable to him in damages for the negligent killing of his horse, introduced testimony which tended to establish the following state of facts:    The horse was killed in a cut, some ten feet deep, at a point on the railroad track 590 feet below a crossing, "on an up-grade."    A few moments before the train ·by which the horse was killed approached this crossing, he was seen "standing about thirty feet from the track;" and when the train reached the crossing, the horse "jumped on the track at the mouth of the cut," 285 feet below the crossing, and ran in this cut, in front of the train, a distance of 305 feet

before being struck. The horse was killed on a curve, which extended a considerable distance above the crossing, and therefore could not have been seen by the engineer until about the time the train arrived at the crossing, at which time "the danger signal" was blown. The "local train," and perhaps others, had been known to stop within a distance of 590 feet from this crossing, which was near a station; but the train which ran over the horse was "the fast train," which did not stop at that station, and had never been seen to come to a stop within that distance. The railway company undertook to overcome the prima facie case thus made out by the plaintiff, and to this end called as witnesses the engineer and conductor in charge of its train on the occasion above mentioned. The engineer testified: "The train was on schedule time and running at 35 or 40 miles an hour. I first blew the whistle for the crossing. As the engine turned the curve, I saw the horse standing off about 25 or 30 feet from track. Nothing to indicate his coming toward the track. Just about the time I reached the crossing, the horse walked to the edge of the cut and jumped down on the track. . I immediately shut off steam, applied the emergency brakes, and sounded the danger, or cattle, alarm. It was on a curve to the left. I was looking to the front, and the brakes worked perfectly. I did all in my power to stop the train, using every appliance on the engine. I did not reverse the engine. Engines are no longer reversed since the improved air-brakes are used, such as we had on this engine. After the horse jumped down on the track he ran for some distance, until finally struck by the engine. At the time he was struck the speed had been reduced to something under five miles an hour, and would have been stopped before the second car passed by him. The train never came to a standstill, because I was signalled to go ahead by conductor. If it had been a member of my family or my wife on the track, as this horse was, and under the same circumstances, I couldn't have stopped the train. I can't state the exact distance the train ran after the horse jumped on the track. A train like the one I had could, in my judgment, be stopped in 150 or 175 yards. We only had two passenger-coaches; but a train of six coaches, with good air-brakes, can be stopped in as short a space as one with two coaches. The local passenger-train has been stopped a number of times within the distance testified

about by plaintiff's witnesses, because it was not running as fast, and for the further reason we are always watching for signals and approach the stations slower." The curve tended to "impede my sight from crossing to where horse was killed; there was a slight up-grade from crossing; there was a dip in the road; and from the crossing to where the horse was killed was slightly up-grade." The testimony of the conductor merely went to corroborate the statement given by the engineer as to the circumstances under which the horse was killed. The further fact was brought out that the fireman on that train at that time was no longer in the employ of the company.

In view of the uncontradicted testimony of the company's engineer, which showed not only that he exercised due diligence in maintaining a lookout for stock but that he used every possible effort to avoid injury to the plaintiff's horse, we can not but agree with counsel for the defendant company that a verdict against it was wholly unwarranted. See, in this connection, *Georgia R. Co. v. Wall*, 80 *Ga.* 202, and the cases cited in support of the ruling announced in *Seaboard Air-Line Ry. v. Walthour*, 117 *Ga.* 427. No appearance was made in this court in behalf of the prevailing party in the court below; so the theory upon which he relied for a recovery is purely a matter of conjecture. The witnesses introduced in his behalf did not undertake to say, even as matter of opinion, that his horse might sooner have been discovered or that the train could have been stopped within a shorter distance than that between the crossing and the point at which the animal was overtaken and hurled from the track. Accordingly, the plaintiff's case was essentially weaker than that relied on by the plaintiffs in *Central Ry. Co. v. Waxelbaum*, 111 *Ga.* 812, in which this court held that the testimony introduced by the defendant " was practically uncontradicted, for the mere differences of opinion among the witnesses as to time, distances, the range of vision, etc., did not involve questions of credibility or produce conflict as to the actual facts of the occurrence." There was, in this case, no dispute or difference of opinion as to the distance between the crossing and the place at which the plaintiff's horse jumped upon the track, or as to the distance the train ran after the engineer discovered the presence of the animal in a situation of peril. On the contrary, the engineer testified, " I can't state the exact distance the train

ran after the horse jumped on the track;" and he certainly did not undertake to say that the witnesses in behalf of the plaintiff did not correctly give the distance from the crossing to the place where the horse got upon the track, or were mistaken as to the distance the train ran, after reaching that point, before the horse was overtaken and killed. That the engineer further testified that, in his judgment, a "train like the one" he had could "be stopped in 150 or 175 yards" can not be regarded as authorizing the conclusion that he testified falsely when he said, in effect, that it was impossible for him to stop the train in time to avoid injury to the animal. He clearly was not undertaking to impeach himself, or to in any way qualify his unequivocal and positive statement that he did everything in his "power to stop the train, using every appliance on the engine," without avail. At best, his estimate of the distance within which a train such as that he had could be stopped was merely the expression of an opinion not supported by the actual physical facts to which he swore. The better view would therefore seem to be, not that he deliberately committed perjury when he testified as to what efforts he made to stop the train, but that the opinion he expressed was, considered in the light of the facts disclosed by him, obviously erroneous and entitled to no weight whatsoever. Even had this opinion been elicited from another witness who professed to be an expert on the question as to the distance within which a train of a certain description, running at a specified rate of speed, could be stopped upon a grade similar to that upon which the company's train was running when the plaintiff's horse was killed, it would be a matter of grave doubt whether or not the verdict of the jury could lawfully be permitted to stand. Indeed, this court, in the case of *Atlanta & Charlotte Air-Line Ry. Co.* v. *Gravitt*, 93 *Ga.* 370 (7), expressedly ruled that "The mere opinion of a locomotive engineer, that a heavy passenger-train consisting of a locomotive and six cars, running down grade at forty-five miles an hour, could be stopped within a distance of one hundred yards, is not sufficient to overcome the positive and uncontradicted evidence of the engineer and fireman upon the identical train, that all was done which could possibly be done to stop it, and that nevertheless it was not stopped within a distance of over four hundred yards; especially when the evidence of these witnesses was strongly corroborated by others who were ex-

perts in such matters." In other words, physical facts, when established by evidence which stands uncontradicted and is therefore to be taken as in accord with the truth, have a persuasive insistence which can not be lightly or arbitrarily disregarded.

It may further be noted that the defendant company accounted for the absence of the fireman who was on its train at the time the killing of the plaintiff's horse occurred, the fact being made to appear that this employee was no longer in its service. In view of this showing as to the reason he was not introduced as a witness by the company, it is clear that no inference unfavorable to it, regarding the manner in which it conducted its defense, could arise. *Weinkle* v. *B. & W. R. Co.*, 107 *Ga.* 367 (4), 372; *Knox* v. *State*, 112 *Ga.* 373 (2); *Central Ry. Co.* v. *Bernstein*, 113 *Ga.* 175 (5), 180, and cit. Certainly the mere fact that the fireman was not produced and sworn as a witness can not be considered as strengthening the plaintiff's case or as warranting the jury in disregarding the testimony of the company's engineer and conductor. It is difficult to conceive how a railway company can successfully resist an action for damages brought against it for the killing of live stock, if the defense made in the present case can properly be said not to be such as demanded a finding in its favor. The jury, because of personal knowledge which enabled them to conclude that the company's train might have been stopped within a distance of 590 feet, notwithstanding it was running at the rate of "35 or 40 miles an hour," may have been entirely satisfied that the exercise of due diligence by the engineer would have averted the casualty. But if so, they necessarily predicated their verdict, not upon the evidence adduced on the trial of the case, but upon what they knew, or thought they knew, concerning the questions of fact upon which they were called on to pass. We can not undertake to say, as matter of personal knowledge, within what distance such a train as that which killed the plaintiff's horse could, under the circumstances disclosed by the evidence in this case, be brought to a standstill; nor are we at liberty to take judicial cognizance that 590 feet was (or was not) a sufficient distance within which to bring about that result. If, in point of fact, the train of the defendant company could and ought to have been stopped within a shorter distance, the plaintiff should have sought by the introduction of evidence to establish the real

truth in this regard.    The grant of a new trial, which will be the effect of our judgment in this case, will afford him an ample opportunity to do so.

*Judgment reversed.    All the Justices concur.*