TARVER, sheriff, *v.* SILVER.

No. 10470. JANUARY 18, 1935.

*M. B. Peacock,* for plaintiff in error.   *S. B. Lippitt,* contra.

GILBERT, Justice.   This case involves the transportation of a truck-load of liquor which the petitioner alleged he was taking from Newark, N. J., to New Orleans, La., in interstate commerce, and which the defendant contended the petitioner had brought into the State of Georgia for the purpose of violating the State prohibition law.   The court in the injunction proceedings had a broad discretion in case of conflicting evidence, as has uniformly been held.   "This power, however, being extraordinary, ought to be exercised with great caution, and applied only in a very clear case and in such manner as to prevent injustice and unnecessary injury, and it is also necessary that there should be some special circumstances bringing the case under some recognized head of equity jurisdiction.   The court should therefore be guided by the fact that the burden of proof rests upon the complainant to establish the material allegations entitling him to relief.   14 R. C. L. 308, § 5.   "There must be no misrepresentation or concealment of important facts, and if plaintiff keeps in the background facts which are important to enable the court to form its judgment, such conduct is of itself sufficient to prevent the interposition of the court."   High on Injunctions, § 11.   "Full and candid disclosure of all facts must be made in the application for injunction; and if the case of complainant shows that it has not been made, or if it shows a concealment of facts which would, if stated, materially affect the conscience of the court, the chancellor may properly refuse an injunction."   Reddall *v.* Bryan, 14 Md. 444 (74 Am. D. 550).   "The

rule has been frequently laid down broadly that a preliminary injunction will not issue where the right which the complainant seeks to have protected is in doubt, where the right of the relief asked is doubtful, or except in a clear case of right." 32 C. J. 36, § 16. Injunction is not of right but of grace; to warrant the interposition of this strongest arm of the law the case must not be a sham but a well-grounded complaint, the bona fides of which is unquestioned, or capable of vindication if questioned. Kenton *v.* Railway Co., 54 Pa. 401. "The power of . . ordering injunctions should be prudently and cautiously exercised, and except in clear and urgent cases should not be resorted to." Civil Code (1910), § 5477. This court held, in *Gaines* v. *Holmes,* 154 *Ga.* 344 (3) (114 S. E. 327, 27 A. L. R. 98): "There is no law of this State which makes contraband or unlawful the transportation of intoxicating liquors on a through bill of lading in interstate commerce on an interstate railway train from one State to another State, merely passing through this State, where there has been no delivery to any person within this State, nor any access or control exercised by any person within this State, except the common carrier in the act of transportation." Mr. Justice Hines specially concurred in the judgment, "because the liquor involved was not contraband. Under the police power of this State contraband liquor can be seized and confiscated, whenever found within the limits of this State, although the same may be moving as an interstate shipment by rail carrier. There is no property in intoxicating liquor, under circumstances which render it contraband, which is protected by the provision of the interstate-commerce clause of the constitution of the United States, against the police power of the State; and under this power such liquor can be seized and destroyed under any and all circumstances. I do not understand that there is anything in the opinion holding the contrary; but I wish to make my position in this matter clear."

Why was that shipment held not contraband? That was fully explained in the opinion, viz.: "There was evidence to the effect that the whisky was loaded on a railroad train in Kentucky for transportation over different lines of railway from Kentucky to Los Angeles, Cal., under a through bill of lading from the point of shipment to the destination in California. It is not contended that the whisky was to be delivered anywhere within the territorial

limits of the State of Georgia, or that it was delivered, or that any one had access to it except the sheriff of Dade County, who made the seizure. It is true that the whisky was shipped to the order of the consignor, with direction to notify Brunswig Drug Company; and it is contended that the consignor could have had access to it at any point en route to the final destination. It does not appear, however, that the consignor exercised the right to take possession of it within the territorial limits of Georgia, or attempted to do so; and so far as the principles of law applicable to the case are concerned, it will be treated as though the shipment were one passing through the State of Georgia without delivery to any person in the State, and to which no person in the State exercised the right of access to it or any right of property therein, save that the railway company as a common carrier exercised possession and control for the purpose of through transportation. In General Oil Co. *v.* Crain, 209 U. S. 211 (28 Sup. Ct. 475, 52 L. ed. 754), it was said: 'Merchandise may cease to be interstate commerce at an intermediate point between the place of shipment and ultimate destination; and if kept at such point for the use and benefit of the owners and under the protection of the laws of the State, it becomes subject to the taxing and police power of the State.' In this case no act of the owner or of any other person caused the whisky shipment to terminate in this State, but, as above stated, the contrary definitely appears. The act of Congress known as the Volstead act, among other provisions, contains the following: 'Liquor for nonbeverage purposes and wine for sacramental purposes may be manufactured, purchased, sold, bartered, transported, imported, exported, delivered, furnished and possessed, but only as herein provided, and the commissioner may, upon application, issue permits therefor.' Fed. Stat. Ann. Supp. 1919, p. 206, § 3. On the hearing of the case the petitioner offered in evidence certain permits purporting to have been issued by the proper Federal authorities, authorizing the transportation of the specific shipment of whisky from Glenn Creek, Ky., to Los Angeles, Cal.; and also similar authority for the sale of the whisky by Gaines & Co. and the purchase of the same by Brunswig Drug Company."

Having announced principles of law that apply to circumstances of liquor being transported from one State to another State through an intermediate dry State, we shall now consider the testimony

which was introduced at the hearing in the present case, as an aid in determining whether the facts justified the grant of an interlocutory injunction until a jury could pass upon the facts, or whether they were such as left no reasonable inference save that the petitioner was violating the prohibition law of Georgia and, under the guise of interstate commerce, was seeking to hide his real, unlawful purpose. At the hearing Silver did not testify in person, but he introduced his sworn petition and other writings. He introduced no affidavits and no oral evidence. This fact is important for the ascertainment of the truth. Although there were three men co-operating with him in transporting the liquor when the truck was seized, neither of them was sworn as a witness and thus made subject to cross-examination. Their silence authorized the court to draw conclusions fatal to the petitioner's contentions. Failure or refusal to make them witnesses subject to cross-examination was a matter within the control of petitioner. This must be assumed, since he made no effort to explain or account for their absence. Petitioner chose to depend upon the weaker evidence of the allegations of his petition and other documents mentioned. Petitioner also chose not to introduce properly certified copies of the laws of New Jersey and Louisiana as to intoxicating liquors, but elected to depend upon such allegations in his petition on the subject as he desired. The courts of Georgia do not take judicial cognizance of the laws of other States. *Southern Express Co.* v. *Sottile,* 134 *Ga.* 40 (67 S. E. 414) ; *Southern Express Co.* v. *Hanaw,* 134 *Ga.* 445 (7) (67 S. E. 944, 137 Am. St. R. 227) ; *Lowe* v. *State,* 179 *Ga.* 742 (177 S. E. 240). In these circumstances the court might well hold such allegations to be unproved. Whether there are provisions of those foreign statutes not beneficial to the petitioner's case the court could not know. The case demanded a complete, bona fide showing, and no concealment, before the extraordinary power of injunction was authorized. In his petition Silver alleged that he was transporting the shipment in interstate commerce from Newark, N. J., to New Orleans, La., and had made no attempt to unload, dispose of, deliver, or use said whisky in the State of Georgia. He introduced in evidence a letter from the chief deputy State tax-collector of New Orleans, addressed to Aaron Kravitch, an attorney in Savannah, Ga., to the effect that liquor license No. 69 had been issued on June 15, 1934, for account of Wolfe Silver, explaining

that it was not enclosed in the letter because the "license law" of Louisiana required the same to be posted at the premises where the liquor business is conducted, and requesting the attorney to have his client call for the license. An envelope in which the said letter was said to have been sent was introduced in evidence; also a notice from the State Revenue Commission of Georgia of the issuance of a number plate to Wolfe Silver of 17E. Congress Street, Savannah, Ga., for use on a model BB-40 Ford truck, motor No. 878641, the same being license No. 59160, June, 1934. The application for the truck license did not seek the privilege of doing a business in interstate commerce, nor was such a privilege granted. The petitioner had *no bill of lading,* issued by an interstate carrier. The liquor was at all times in the custody and control of Silver or his agents, and they had complete access to it during its transportation.

For the defendant A. J. Denson testified that he and W. S. Gibson went to what is known as Five Points on the Sylvester and Albany highway, about 10 o'clock on the morning of June 23, 1934, and saw a Ford V-8 truck stopped on the road, headed towards Albany, which truck they found to contain 125 cases of whisky and gin; that two men, R. C. Mason and Henry Powell, were with the truck; that they said they had preserves, but that the truck was found to contain whisky and gin; that he sent Gibson with the two men to town and he remained with the truck; that a short time thereafter a man, whom he later learned to be T. L. Johnson, drove by the truck, turned around, came back and called out to know what the trouble was; that witness then stepped from behind the truck and informed Johnson he was wanted in connection with the whisky; that he took him to town and locked him up; that of 125 cases on the truck some were broken and some of the bottles missing from some of the cases, some of the cases not full cases. The defendant testified that on June 23, 1934, he learned that A. J. Denson, deputy sheriff, and W. S. Gibson, county officer, had arrested Wolfe Silver, T. L. Johnson, R. C. Mason, and Henry Powell; that he had checked the whisky which was then in Dougherty County jail, and which was seized by Denson and Gibson, and that there were 125 cases of whisky and gin, there being five from the number which were broken cases, that is, that the boxes had been broken and some of the whisky or gin was missing therefrom. Bob Culpepper testified that he was one of the county officers of Dougherty

County and had known Wolfe Silver for approximately 15 or 20 years, and knew that he was in the whisky business and resided in Savannah, Ga.; that witness was not present when the whisky was seized or when the arrests were made, but later talked to Silver in jail; that Silver stated that he was bringing 100 cases of this whisky to Ed Gleaton, who resided in Dougherty County, that said whisky was to have been delivered to Gleaton, but was seized by the officers; that Silver asked him about Gleaton's financial condition and whether or not he would have been able to pay for the 100 cases of whisky if they had been delivered. Mac McGruger testified that he was confined in the Dougherty County jail at the time the whisky was seized, and that he assisted in unloading the cases of whisky from the truck; that several cases were broken, and some of the bottles missing therefrom. W. S. Gibson testified that he accompanied A. J. Denson, deputy sheriff, on the morning the load of whisky was found on the Sylvester-Albany highway, which truck they found to contain 123 cases of whisky and gin; that the two men driving the truck were taken by him and placed in Dougherty County jail; that he then went to the home of Ed Gleaton, located on the Sylvester-Albany highway, walked into his kitchen, and found Wolfe Silver sitting there talking to Ed Gleaton; that he asked Silver if he had a truck, and he first denied it, but later admitted that he had a truck-load of whisky, stating that he was taking it to New Orleans.

Ed Gleaton testified that on Tuesday afternoon, on arriving at his home about 7:30, he found Johnson and Thornton sitting in his kitchen; that Thornton introduced Johnson, who proceeded to tell him his business and to exhibit samples of different grades of whisky; that from the samples 100 cases were tentatively agreed upon, with the understanding that he would phone Johnson Wednesday if he decided to take the whisky; that about 1:30 o'clock Friday night Johnson, whom witness recognized, called him over the telephone, and after a little conversation put the "boss, Bo-Peep," on the phone; that the latter informed witness he did not have the load that was wanted by witness, but had something just as good, and that if it was not satisfactory witness would not have to pay for it, that they would leave Savannah right away and arrive at witness's place about daylight or probably a little later, and that later Johnson and Silver drove in his backyard, walked into the kitchen,

pulled out samples and said, "Here is what we have got; I am satisfied it will please you; if it don't we will load it back up and take it back to Savannah;" that they asked where Thornton was, that witness said he was uptown, and that he would not consider anything except what they had bought until Thornton came in and looked at the goods himself; that after a fruitless drive in an effort to locate Thornton they returned to the home of witness, and the other two asked if the load of liquor might be brought into witness's garage for unloading and inspection, and that if witness did not like it they would take it back to Savannah; that Bunk Gibson, county officer, walked in, asked "Bo-Peep" (Silver) if he had a truck on the road, and he said no, but later admitted it; and that Gibson then took Silver away, and witness had not seen him any more until in jail. Witness further testified that he and Thornton had been in the liquor business about thirty days.

Did the court err? In our opinion, a recital of the above evidence and circumstances answers the question. Here we have a man who in his petition claims that he was transporting his load of liquor in interstate commerce. In an effort to show that the liquor was intended for disposal at New Orleans, La., he introduced in evidence a letter from the tax-collector's office in New Orleans, addressed to an attorney at Savannah, Ga., which letter purports to show the issuance of a liquor license in favor of Wolfe Silver. But we are struck with the fact that apparently the license had been issued "pursuant to telephone . . telegram," etc., as stated by the Louisiana official, and that as the Louisiana tax-collector's office had not been called on for the license to be displayed on the premises where liquor is to be sold, as required by the Louisiana law, according to the letter from the tax-collector's office, it is inferable that the petitioner had not provided any business location for the reception of the liquor in New Orleans or arranged with anybody to accept the license. The petitioner "alleged" that he had made no effort to unload, dispose of, or deliver said whisky in the State of Georgia; but what does the evidence reveal? An invoice is introduced which shows that the load consisted of certain cases of whisky and gin, purchased from Rio Distillers Inc. of Newark, N. J., and the total number of cases adds up 153. At the time of the seizure there were 125 cases on the truck. What had Silver done with the other 28 cases? He did

not "make a full disclosure" of that situation to the court, and from the sworn testimony of witnesses for the defendant it is evident that the alleged interstate character of the shipment, if it had in fact ever existed, had been changed by the removal of part of the contents. A. J. Denson, who found the truck on the Sylvester-Albany highway, swore that the truck contained only 125 cases, some of which were broken and bottles missing therefrom. This was corroborated by the defendant, who checked the whisky at the jail and by Mac McGruger, a prisoner, who helped unload the whisky at the jail. Was the whisky shipment broken in Georgia? Ed Gleaton testified that Silver arrived at his home on the Sylvester-Albany highway Saturday morning, following the telephone call from Savannah, and showed him samples of what he had to offer in the truck. If the samples did not come from the shipment that left Newark, N. J., petitioner had ample opportunity to account to the court for the absence of the 28 cases, but he chose to remain silent when he ought to have spoken. Does the evidence demand a finding of bad faith? The burden is on the petitioner to prove good faith, which must be demonstrated before an injunction can rightfully issue. The witness Gleaton, who had been in the liquor business with Thornton for only 30 days, swore that on Tuesday before the seizure on Saturday he returned to his home and found Johnson and Thornton there, that Johnson was introduced to him by Thornton, and that he selected 100 cases from samples exhibited by Johnson. This Johnson is the same man who was apparently convoying the truck, as the witness Denson testified that Johnson drove by the truck at the time of seizure, then turned back and called out to know what the trouble was. It was to be decided Wednesday night whether or not the order for 100 cases would be definitely placed with Johnson, who was undoubtedly the agent or associate of Silver. On Friday night Johnson called Gleaton, and after some conversation put his "boss, Bo-Peep," on the telephone. The latter informed Gleaton that he did not have the load that had been desired by Gleaton, but had something just as good, and if it was not satisfactory to Gleaton he would not have to pay for it; that they would leave Savannah at once and arrive at Gleaton's place about daylight or a little later; that that was the last witness heard until Silver and Johnson drove into his backyard, walked into the kitchen, pulled out samples and said, "Here is what we have got;

I am satisfied it will please you; if it don't we will load it back up and take it back to Savannah; that witness told him he. would not consider anything except what had been purchased until Thornton came in and looked at the goods himself; that after a fruitless drive to locate him, they returned to the home of witness, who was asked by the others if the load might be brought into the garage of witness for unloading and inspection; and that Gibson, the county officer, came in and asked Silver if he had a truck on the road and that Silver said no, but, when asked if he was sure, admitted that he had, and that Gibson then took him away. Bob Culpepper, a county officer, swore that he had known Silver for 15 to 20 years, that he was in the whisky business and resided in Savannah, Ga.; that Silver, when in jail, told him he was bringing the load of whisky to Gleaton, and asked witness if he thought that Gleaton would have been able to pay for it if delivery had been made. W. S. Gibson, who in company with A. J. Denson, found the truck-load of whisky on the Sylvester-Albany highway, swore that after arresting the two men with the liquor car he went to Gleaton's home Saturday morning and found Silver there, that Silver first denied that he had a truck-load of whisky but then admitted that he had and claimed to be taking it to New Orleans. The evidence of defendant's witnesses completely rebutted the allegations in the petition of Silver as to the interstate character of the shipment, and showed that at the moment of seizure he was exhibiting samples of what he had to offer Gleaton, and that his hands were not clean as to the very shipment which he sought to have restored to him by a court of equity. Confronted with this evidence, he made no effort to contradict it or to impeach the witnesses who gave it.

"The law presumes all witnesses are honest and tell the truth, until the contrary appears by proof." Perjury may not be arbitrarily imputed to any witness. *Georgia Talc Co.* v. *Cohutta Talc Co.*, 140 *Ga.* 245 (5) (78 S. E. 905) ; *Humphrey* v. *State*, 141 *Ga.* 671 (2) (81 S. E. 1034) ; *Cornwall* v. *State*, 91 *Ga.* 277 (5), 278 (18 S. E. 154) ; 40 Cyc. 2555; *S. A.-L. Ry.* v. *Walthour*, 117 *Ga.* 427 (43 S. E. 720) ; *Georgia Southern & Florida Railway Co.* v. *Thompson*, 111 *Ga.* 731 (36 S. E. 945) ; *Georgia & Alabama Railway Co.* v. *Cook*, 114 *Ga.* 760, 762 (40 S. E. 718) ; *Dollar* v. *Busha*, 124 *Ga.* 521, 523 (52 S. E. 615) ; *M. & B. R. Co.* v. *Revis*, 119 *Ga.*

332 (46 S. E. 418); *Hamilton* v. *State,* 143 *Ga.* 265 (5) (84 S. E. 583). The evidence and the circumstances left no room for doubt that under General Oil Co. *v.* Crain, 209 U. S. 211, supra, he had, as consignee, and in control of the shipment, broken the interstate character of the shipment, if it had ever been interstate. The petitioner did not carry the burden that was upon him. This was not a case for reserving for the consideration of a jury the question of some reasonably doubtful issue and in which the discretion of the court might reasonably be exercised in granting an injunction. The principle here involved was directly ruled in *Trippe* v. *Pritchard,* 134 *Ga.* 460 (67 S. E. 1030). In the opinion it was stated: "One of the plaintiffs failed to testify at all, and the other, though testifying, failed to testify on the controlling point. . . It was incumbent upon the plaintiffs to show by evidence such a state of facts as would authorize the judge to find the existence of a trust. The evidence was not sufficient to accomplish that purpose. . . The judge has a broad discretion in granting such orders, but the nature of this case is not such as to authorize the preservative order" (the grant of an interlocutory injunction). See also *Eminent Household &c.* v. *Thornton,* 134 *Ga.* 405 (67 S. E. 849). The case presented to the court showed petitioner with unclean hands, not carrying the burden that equity places upon him, concealing facts which were damaging and uncontroverted. His allegation of interstate commerce was mere sham and pretense. Moreover, it was merely a conclusion. The evidence manifestly demanded a finding against him. The court erred in granting the injunction.

*Judgment reversed. All the Justices concur, except Russell, C. J., and Atkinson, J., who dissent.*

RUSSELL, Chief Justice, dissenting. It is always a matter of personal regret when my views of the law and facts of a case are not in concurrence with those of my colleagues. In this case I have such a profound respect for the character and ability of Mr. Justice Gilbert, who has prepared the opinion in behalf of the majority of the court, that after a most careful examination of the several features of the evidence and of the law applicable to his views it is extremely unpleasant for me to express an entirely different view, in dissenting from the holding of the majority that the judgment of the chancellor in not refusing to grant an interlocutory injunction is a manifest abuse of discretion. The argu-

136

ment of the majority was cogently presented, and personally I would prefer to agree silently to the opinion of the court, because I know of course that a mere dissent is barren of result in so far as the litigation under consideration is concerned. But after a thorough examination of the record I am convinced that it is not manifest that in this case the chancellor has abused his discretion in granting an interlocutory injunction and maintaining the status of the case until the issues of fact in the case have been passed upon by a jury. To adopt the thought of Mr. Justice Cobb in *Johnson* v. *State*, 128 *Ga.* 102 (57 S. E. 353), it is my opinion that it is my duty as a Justice of this court to uphold, as far as I can, the action of the chancellor in this case in the exercise of the discretionary powers entrusted to him by law and unbroken precedent. As a legal proposition, it can not be questioned that in the grant or refusal of interlocutory injunctions the chancellor is the sole judge of the credibility of the witnesses, and it is also the prerogative of the chancellor to determine the quantum of evidence which will justify the grant of equitable relief in each case before him for adjudication. This is not a case in which the intervention of equity is sought in a criminal case or quasi-criminal case. The proceeding by condemnation which the petitioner in this case sought to arrest by injunction is merely an action in rem. *Gaines* v. *Holmes*, 154 *Ga.* 344 (114 S. E. 327, 27 A. L. R. 98). The Civil Code of 1910, § 5497, declares: "The granting and continuing of injunctions must always rest in the sound discretion of the judge, according to the circumstances of each case." It is my opinion that the plaintiff introduced sufficient evidence to fully authorize the chancellor, his honor Judge Gardner, to grant an interlocutory injunction if the court preferred to believe the evidence in behalf of the petitioner rather than that introduced in behalf of the respondent. Shall this court say that the chancellor should believe one rather than the other? To assert such prerogative upon the part of this court would, in my opinion, be a reversal of numberless decisions of this court to the contrary.

It is nothing novel in the practice for either party to introduce its pleadings, verified upon oath, in hearings of applications for interlocutory injunctions, and the court may accept that evidence under oath as the truth in preference to testimony contradictory thereof. The rules referred to in the opinion of the majority do

not require a party to bolster his evidence, even though it consists merely of his petition duly sworn to. The case might be different if the affiant merely swore that the facts stated in the petition so far as they rest within his own knowledge are true, and so far as they were obtained from others he believes them to be true, etc. But in this case the petition was absolutely and unqualifiedly verified by the oath of the petitioner; and the petition made every allegation necessary to require the grant of an interlocutory injunction, unless rebutted by evidence in behalf of the respondent. "Where an equitable petition was not verified otherwise than by an affidavit of the plaintiff averring the truth of its allegations so far as the same related to his personal knowledge, and his belief in their truth so far as his knowledge concerning same was derived from others, and when the affidavit in this form did not amount to positive proof of portions of such allegations the establishment of which was essential, but as to the same was hearsay only, it was, upon a hearing of such petition at which 'there was no evidence introduced and no evidence or affidavits before the court except that contained in the petition and answers,' in the latter of which the equity of the former was completely sworn off, erroneous to grant the extraordinary relief sought." *Bigbee* v. *Satterfield,* 105 *Ga.* 841 (32 S. E. 139). The principal point in this case may be whether the liquor seized by the officers was being transported in interstate commerce, or whether at the time of its seizure it was not in interstate commerce but merely in possession of the petitioner in violation of the bone dry law. As to this, the petitioner swore positively that it was being carried in interstate commerce between Newark, N. J., and New Orleans, La., at the time it was seized. He states on oath that it is not a violation of law to sell intoxicants in New Jersey or Louisiana, and by subpœna duces tecum he produced documentary evidence showing that he had paid over $700 for government licenses and had taken preliminary steps to be enabled to sell liquor in Louisiana. The writings that he produced were pertinent and relevant, as held by this court in *Gaines* v. *Holmes,* supra. The petitioner having sworn that he knew the law and that it was the law in Louisiana and New Jersey, it would seem that proof that this was not the law should have been offered by the respondent.

For the reason already stated, it is unnecessary in this dissent to recapitulate various other circumstances that authorized the

chancellor to credit the evidence in behalf of the petitioner rather than that in behalf of the respondent. One thing is certain, that, considering the large number of witnesses who appeared to be residents of the circuit over which the court presided, and more than one of them officers, it is presumed that the knowledge of the chancellor, however extensive or limited it might be, is probably greater than that of the members of this court, some of whom have never heard of a single one of the dramatis personæ. One of the witnesses swore that he knew the petitioner had sold liquor for years. It does not appear when or where the liquor was sold; but even if the petitioner be guilty of the offense of selling liquor, it has never yet been held that the sale or possession of liquor was a crime involving moral turpitude authorizing the discrediting of the witness. As said in the full-bench decision of this court in *Volunteer State Life Insurance Co.* v. *Chapman,* 173 *Ga.* 633 (160 S. E. 783) : "There are no circumstances in the record in this case that withdraw it from the operation of the well-settled rule that 'in hearings upon applications for interlocutory injunctions, where the evidence upon material issues of fact is in conflict, the grant or refusal of applications is within the discretion of the chancellor, and the exercise of his discretion in granting or refusing the relief prayed for will not be controlled unless manifestly abused.' No abuse of discretion appears in this case; and the evidence, though conflicting, was sufficient to authorize the affirmative relief granted. . . The court did not err in granting the interlocutory injunction." The contention of the respondent is that the defendant in error has been guilty of a criminal offense in violating the laws of the State of Georgia; and the opinion of the majority apparently is somewhat influenced by this contention, because in the conclusion of the court's opinion it is said: "The evidence manifestly *demanded* [italics mine] a finding against him." If the court gave any weight to the evidence in behalf of the petitioner, including his verified petition, the case bristles with issues of fact illustrating the question as to whether the liquor seized was an interstate shipment. The court properly held that these issues of fact were for solution by a jury in enabling the court to determine whether a permanent injunction should be granted or refused. The sheriff and other officers, if the jury determines that an injunction should be refused, can pour out the liquor and proceed by condemnation of the car to receive the

reward provided by statute. But should the jury decide that the liquor was not contraband and subject to be destroyed, then petitioner should have his property. The *Gaines* case, supra, concerned shipment by railroad; but the method of transportation or the vehicle used for transportation is entirely immaterial, provided the shipment is bona fide an interstate shipment. In the case at bar, if the liquor was transported from New Jersey to Savannah in a covered wagon, and the wagon broke down at Savannah, and nothing more was done than to transfer the unbroken shipment from the wagon to an automobile, this would not be a violation of law.

In *Davis* v. *Griswell*, 179 *Ga.* 342 (175 S. E. 909), it was held that "Under the pleadings and the evidence the judge was not required as a matter of law to find that the beer and the vehicle were being employed in interstate commerce. The evidence disclosed circumstances in view of which the judge was authorized to discredit the plaintiff's contention and to find against him, even though the testimony was not directly contradicted." So in this case the judge was not required as a matter of law to find that the shipment was not being transported in interstate commerce, and he was authorized to discredit the respondent's contention and find against him. We have been unable to find a case, and none has been cited, in which this court has reversed the discretion of a chancellor in granting, upon conflicting evidence, an interlocutory injunction, where the only effect of the grant of the relief was to preserve the status, and where no injury resulted to the defendant therefrom. In *Everett* v. *Tabor*, 119 *Ga.* 128 (46 S. E. 72), it was held: "A denial by the defendant of the facts set up in the equitable petition, or a conflict in the evidence, does not necessarily require a refusal of interlocutory relief. . . There should be a balance of convenience in such cases, and a consideration whether greater harm might be done by refusing than by granting the injunction. . . Where the evidence is conflicting, and it appears that the injunction if granted would not operate oppressively to the defendant, but that if denied the complainant would be practically remediless in case he should thereafter establish the truth of his contentions, it would be strong reason why the chancellor should exercise his discretion so as to preserve rights by preserving the status. . . There are, however, exceptions to the rule that an

injunction will be refused where the defendant's answer swears off the equity. *Holt* v. *Bank of Augusta,* 9 *Ga.* 554; *Coffee* v. *Newsom,* 8 *Ga.* 449; *Coltle* v. *Harrold,* 72 *Ga.* 831 (7). For while it is true that the complainant must always establish to the reasonable satisfaction of the chancellor . . the fact on which the right is predicated, this does not mean that he must establish it beyond controversy. A denial by the defendant, or a conflict in the evidence, does not necessarily require a refusal of the interlocutory relief. In all such cases the chancellor must exercise a sound discretion. . . There should be a balance of conveniences, and a consideration whether greater harm might result from refusing than from granting the relief prayed for. If the grant of an injunction in such a case would operate oppressively to the defendant, the restraining order should be refused; but if it appears that if the injunction were denied the complainant would be practically remediless in the event he should thereafter establish the truth of his contention, it would be strong reason why interlocutory relief should be granted. The delay to one party would not counterbalance the irreparable injury which might flow to the other, if the chancellor made a mistake in passing on the disputed issue of fact. Under such circumstances it would generally be a wise exercise of discretion to preserve the rights by preserving the status." In this case there might have been an abuse of discretion if the grant of the injunction operated oppressively to the sheriff, but I am not of the opinion that such a contention could be seriously maintained. Mr. Justice Atkinson concurs in this dissent.