25063, 25064, 25065.   DAVIS *v.* SOUTHERN RAILWAY COMPANY *et al.;* and *vice versa.*

Decided April 27, 1936.

*Henson & Padgett,* for plaintiff.

*Tye, Thomson & Tye, W. O. Wilson, Neely, Marshall & Greene,* for defendants.

Guerry, J.  Al Davis brought suit against the Southern Railway Company and the Louisville & Nashville Railroad Company, alleging that on May 22, 1933, the Northampton Brewery

Corporation shipped via Central Railroad of New Jersey to its own order, and consigned to C. L. Padgett at Chattanooga, Tennessee, 1170 cases of beverage loaded in freight-car MDT. 17195; that while such shipment was in transit and before it reached Knoxville, Tennessee, the plaintiff requested the Louisville & Nashville Railroad Company to have shipment diverted to Jacksonville, Florida, instead of Chattanooga, and to change the routing thereof so that it would travel over the lines of the Louisville & Nashville Railroad Company from Knoxville to Atlanta and thence by connecting carriers to Jacksonville; that, acting under instructions from agents of the Louisville & Nashville Railroad Company, he took up the original bill of lading issued by the Central Railroad of New Jersey and surrendered it to the Southern Railway Company, which issued a new bill of lading routing the car to Jacksonville, Florida, in accordance with the request of the plaintiff; that under these facts the Southern Railway Company became the initial carrier and the Louisville & Nashville Railroad Company became its agent under the existing law pertaining to interstate commerce, and both became liable for damages; that, concurrently with the diversion of this shipment at Knoxville, the plaintiff notified the Louisville & Nashville Railroad Company that it was not his intention to have shipment delivered at Jacksonville, Florida, provided he could find a better market, and gave instructions that the petitioner be notified when the shipment arrived in Atlanta, and that it be held subject to further diversion instructions; that the agent of the Louisville & Nashville Railroad Company accepted these instructions and agreed to hold the shipment for further instructions; that they failed to comply with the instructions, and did not hold the shipment, but delivered it to the connecting carriers under the bill of lading, and refused to have the car returned to Atlanta. The plaintiff did not, at any time before the car reached Atlanta and had been delivered to the connecting carriers, give to the Louisville & Nashville Railroad Company any instructions as to the diversion of this shipment to any other point. Damages were claimed by reason of the delay in shipment to Murphy, N. C., to which point the plaintiff alleged he advised the defendant, after it had surrendered possession to the connecting carrier, that he wanted the car shipped; the damages being the decline in the market price

of the beer contained in the shipment, the alcoholic content of which, according to the bill of lading, did not exceed 4 per cent., it being designated in the petition as 3.2 beer. The cause of the damage was alleged to be the failure of the defendants to hold the beer in Atlanta.

The Southern Railway Company filed a demurrer on the ground that the petition set out no cause of action; that under the facts alleged it was not the initial carrier, but the Central Railroad of New Jersey was the initial carrier, and the fact that it issued a new bill of lading did not transfer to it the liability of the Central Railroad of New Jersey. The Southern Railway Company filed certain special demurrers. The Louisville & Nashville Railroad Company demurred on the ground that the petition did not set out any cause of action; and that its allegations did not constitute the breach of any duty owed to the plaintiff by that defendant. The demurrers were overruled. At the conclusion of the evidence on the trial the judge rendered judgment in favor of defendants. The evidence for the plaintiff disclosed that in 1933 the plaintiff intended to enter the beer business in the City of Atlanta, and that he ordered the beer shipped from the brewery to Chattanooga to his order, from which point it was to be trucked into Atlanta. After the car of beer was shipped, the plaintiff found out that in order to receive the beer in Chattanooga it was necessary, under the law of Tennessee, to pay a dealer's tax of $900; so he decided that "it would be a bad idea to accept beer in Chattanooga." The railroads refused to agree to deliver any beer to him in the City of Atlanta; and "to accomplish a diversion of it here I would have to go to the bank and get the original bill of lading that had been sent by the Northampton Brewery, with sight draft attached, and take up the original bill," and have shipment diverted to Louisville & Nashville Railroad Company at Knoxville. This was done, and the car was rerouted at Knoxville to Jacksonville via Louisville & Nashville Railroad Company to Atlanta, and thence by connecting carriers to Jacksonville. The plaintiff then found that "they had a law in [Florida] just about like Tennessee." He began making inquiries as to restrictions and amount of tax on such beer in South Carolina and North Carolina. The Louisville & Nashville Railroad Company was not notified that the plaintiff wanted to divert the car to Murphy, N. C., until some

hours after the car had left Atlanta for Jacksonville over the connecting line. Quoting from the plaintiff's evidence: "I was waiting until it actually got to Atlanta to tell them to send it to Murphy, because the situation changed so fast and dealers were bringing it in here by truck, and I had to have it landed outside of Georgia and bring it in by truck, and the situation was varying all the time between the time I bought the beer. . . Some of the boys were bringing it in by Chattanooga, and the sheriff stopped them at Marietta, and that knocked out the Chattanooga business, and we had to wait until the last minute; so I was trying to wait until it actually hit Atlanta, to tell them where to put it. . . I didn't say I intended to dispose of that beer in Chattanooga." It was the intention of the plaintiff to bring it to Atlanta, and it was eventually brought into Atlanta from Hamburg, S. C., and sold in Atlanta. The plaintiff excepted to the overruling of his motion for new trial. Each of the defendants excepted by cross-bill to the overruling of their demurrers to the petition.

There can be no question that a car-load of 3.2 beer in May, 1933, was a contraband article in the State of Georgia, and that a common carrier could not legally contract to ship such contraband to a point in this State. With this principle in mind, we come to consider the demurrer filed by the Louisville & Nashville Railroad Company. It is alleged that the defendant agreed to hold this interstate shipment of beer, which, under the decisions of the Supreme Court in *Gaines* v. *Holmes,* 154 *Ga.* 344 (114 S. E. 327, 27 A. L. R. 98), and *Tarver* v. *Silver,* 180 *Ga.* 127 (178 S. E. 377), could be legally transported *through* the State of Georgia so long as it retained its character as an interstate shipment, when it reached the City of Atlanta, for further orders in respect to its delivery by the plaintiff. As was said in *Gaines* v. *Holmes,* supra, "There is no law in this State which makes contraband or unlawful the transportation of intoxicating liquors on a *through bill of lading* in interstate commerce on an interstate railway train from one State to another State, merely passing through this State, where there has been no delivery to any person within this State, nor any *access or control* exercised by any person within this State, except the common carrier in the act of transportation." (Italics ours.) It was further said by the court: "It does not

appear, however, that the consignee exercised the right to take possession of it within the territorial limits of Georgia, or attempted to do so." The question presented in this case is whether, under the allegations of the petition, the contract alleged to have been breached was such a contract as was legal,—the failure to perform an illegal or immoral agreement not giving rise to a cause of action. The Louisville & Nashville Railroad Company insist that if their authorized agent did in fact agree to hold in Atlanta a shipment of beer, which under the law of Georgia was contraband, for the benefit of the plaintiff, such a contract would not be binding, for the reason that it was illegal. In determining when an interstate shipment, otherwise legal, becomes subject to State laws and regulations, we find a discussion of this principle confined entirely to the question of the right of a State to tax or to inspect and charge for the inspection of merchandise. In *Gaines* v. *Holmes,* supra, the following is quoted approvingly from General Oil Co. *v.* Crain, 209 U. S. 211 (28 Sup. Ct. 475, 52 L. ed. 754) : "Merchandise may cease to be interstate commerce at any intermediate point between the place of shipment and the ultimate destination; and if kept at such point for the use and benefit of the owners and under the protection of the laws of the State, it becomes subject to the taxing and police power of the State." It was further said: "The beginning and the end of the transit which constitute interstate commerce is easy to mark. The first is defined as the point of time that an article is committed to a carrier for transportation to the State of its destination or started on its ultimate passage. The latter is defined the point of time at which it arrives at its destination. But intermediate between these points questions may arise." After quoting from Pittsburg Steam Coal Co. *v.* Bates, 156 U. S. 577 (15 Sup. Ct. 415, 39 L. ed. 538), Diamond Match Co. *v.* Ontonagon, 188 U. S. 82 (23 Sup. Ct. 266, 47 L. ed. 394), and Kelley *v.* Rhoads, 188 U. S. 1 (23 Sup. Ct. 259, 47 L. ed. 359), the court said: "The substance of these cases is that while the property is at rest for an indefinite time, awaiting transportation or awaiting a sale at its place of destination or at an intermediate point, it is subject to taxation. But, if it be actually in transit to another State, it becomes the subject of interstate commerce and is exempt from local assessment. Property therefore, at any intermediate

point between the place of shipment and ultimate destination may cease to be the subject matter of interstate commerce." In Bacon v. Illinois, 227 U. S. 504 (33 Sup. Ct. 299, 57 L. ed. 615), it was said: "Property brought from another State and withdrawn from the carrier and held by the owner with full power of disposition becomes subject to the local taxing power notwithstanding the owner intends ultimately to forward it to a destination beyond the State. . . " In Stafford v. Wallace, 258 U. S. 495, 526 (42 Sup. Ct. 397, 66 L. ed. 735, 23 A. L. R. 229), it was said: "Property in a State which its owner intends to transport to some other State but which is not in actual transit and in respect to the disposition of which he may change his mind, is not in interstate commerce, just because of the intention of the owner and may therefore be taxed by the State where it is." In all of these cases this general principle is laid down, to wit: Merchandise shipped in interstate commerce while at rest in a State and under protection of its laws is subject to State taxation, although it has not reached its ultimate destination. It is apparent from the petition that the plaintiff intended to hold this shipment in Atlanta until he could decide where he could best handle it or sell it. Under the principles above laid down, were the merchandise entirely legal in this State, the stopping of it here, under the facts, might have subjected it to the police or taxing power of this State. An even stricter interpretation should be given where merchandise admittedly contraband in this State, and which can be brought here only while a part of an interstate shipment, is held up in this State for the benefit of its owner. A stoppage of such contraband articles in this State at the direction and under the control of the owner takes away from it its character as an interstate shipment, and makes it subject to the laws of this State, and a contract to stop and hold such a shipment for orders to be given, for an indefinite time, is illegal and unenforceable. Moreover it is not alleged in the petition that it would have been lawful for such shipment to be diverted to the State of North Carolina, it not being alleged that such an article was not also contraband in that State. We are therefore of the opinion that the demurrer of the Louisville & Nashville Railroad Company should have been sustained. The cause of action against the Southern Railway Company fails with the cause of action against the Louis-

ville & Nashville Railroad Company. However, we think the demurrer of the Southern Railway Company should have been sustained. U. S. C. A. title 49, § 20(11), makes the intial carrier of interstate shipments liable to the holder of a through bill of lading for any loss, damage or injury to property being shipped, irrespective of how many different connecting carriers there may be. The act as amended July 3, 1926, provides: "That the liability imposed by this paragraph shall also apply in the case of property reconsigned or diverted in accordance with the applicable tariffs filed as in this chapter provided." The initial carrier may recover from the connecting carrier on whose line the loss or damage was sustained whatever amount it may be required to pay to the owner of the property, § 20(12). "Bill of lading issued by initial carrier on interstate shipment governs entire transportation and fixes obligation to participating carriers to the extent applicable and valid." American Ry. &c. Co. v. Fegenbush, 107 Fla. 145 (144 So. 320). In that case it was further said: "Carmack amendment to interstate commerce act held to repose in initial carrier unity of responsibility for entire transportation." In Chicago &c. R. Co. v. Robinson, 180 Ark. 911 (23 S. W. (2d) 976), it was said: "A carrier which made a diversion or reconsignment order of a shipment after it reached its destination named in the original bill of lading, and, before it reached the destination named in the second bill of lading, made a second diversion or reconsignment, was liable as an initial carrier for negligence of a subsequent carrier resulting in damage to the shipment." See also Ga., Fla. & Ala. Milling Co. v. Blish Milling Co., 241 U. S. 190 (36 Sup. Ct. 541, 60 L. ed. 948); M., K. & T. Ry. Co. v. Ward, 244 U. S. 383 (37 Sup. Ct. 617, 61 L. ed. 1213), cited approvingly in *Central of Ga. Ry. Co.* v. *Council,* 163 *Ga.* 494 (136 S. E. 418, 61 A. L. R. 1304). In the present case the Central Railroad of New Jersey was the initial carrier. The point of destination was Chattanooga. Before the car reached this point a diversion order was given, and the connecting carrier, the Southern Railway Company diverted the car at Knoxville to Jacksonville. This diversion took place before the original destination had been reached. The liability was that of the Central Railroad of New Jersey, and the Southern Railway Company did not thereby become the initial carrier. In the *Council* case, supra, it

was said: "For the purpose of fixing liability, the several carriers must be treated, not as independent contracting parties, but as one system; and the connecting lines become in effect mere agents whose duty it is to forward the goods under the terms of the contract made by their principal, the initial carriers, . . and no new conditions can be introduced by the connecting carrier through a second bill of lading." We think that it was error to overrule the demurrer of the Southern Railway Company. Having decided that these cases should have been dismissed on demurrer, it becomes unnecessary to consider the main bill of exceptions.

*Judgment reversed on the cross-bills of exceptions; main bill dismissed. Broyles, C. J., and MacIntyre, J., concur.*