A98A1291. CITY OF DULUTH v. RIVERBROOKE PROPERTIES, INC. et al.

(502 SE2d 806)

ELDRIDGE, Judge.

This case involves an action in equity seeking a mandatory injunction brought by the City of Duluth ("the City") against defendants Riverbrooke Properties, Inc. ("Riverbrooke"), owner and seller, and Everett Major ("Major"), the officer, stockholder, and developer, in order to enjoin the defendants from continued violation of the city's developmental regulations and require them to file the "as-built" survey and certification for the Riverbrooke Subdivision's 15-acre lake. The complex facts at issue are as follows:

In early 1991, Major and Riverbrooke, appellees-defendants, began development of a subdivision which was annexed into the corporate limits of the City of Duluth, appellant-plaintiff. The subdivision had five hundred ninety-nine lots; the subdivision was to be developed in five phases with thirteen separate segments, because there were three different price range segments built simultaneously at each phase.

On February 22, 1991, the original development plans for the entire subdivision with all five phases and the three segments in each phase as one development plan, were filed with the City of Duluth, and were approved under the 1971 Development Regulations. Footnote number 29 of the initial construction plans filed for Riverbrooke stated: "Provide detention pond record drawings (as-built) with the submittal of the final plat or before certificate of occupancy is issued. Record drawings shall include topo of pond verifying volume, outlet structure detail, and hydrology study on as-built data." Footnote 29 referred to the three detention ponds constructed in The Villas, Summit phase V, and The Plantation phase V; Foot-

note 29 did not refer to the lake to be built as a detention facility. The purpose of a detention facility, under the regulations and nuisance law, is to regulate the volume and rate that the discharge of surface water run-off is allowed to occur so that it will not be at a rate, point of concentration, or volume greater than that prior to development.

On January 13, 1992, the City adopted new and stricter development regulations ("1992 Regulations"). Section 8.2.8 of the 1992 Regulations mandated for the first time: "Detention Facility Engineer's Certification and Record Drawings. A certified record survey of each detention facility shall be prepared by a Georgia Registered Land Surveyor. A certified record drawing of the facility shall be prepared based upon this survey; and, based upon the parameters established on the record drawing, an addendum to the Storm Water Management Report shall be prepared which demonstrates that the facility, as constructed, complies with the requirements of these Regulations. The amended Storm Water Management Report shall be certified by a Georgia Registered Professional Engineer." Neither the 1992 Regulations nor the 1971 Regulations defined the term "detention facility" or required that a lake or pond automatically be treated as a detention facility, because the lake received surface water run-off, which incidentally was detained. Article 14 of the development regulations stated that the regulations became effective immediately and applied to any land disturbance permit after the effective date. It also provided a "grandfathered" exclusion to "[a]ny subdivision or other project for which a valid and complete application for a Development Permit shall have been received prior to the effective date of these Regulations." See Section 14.1.2. These new regulations excluded Riverbrooke Subdivision because, under the 1971 Regulations, the City had not issued Riverbrooke "a valid and complete application for a Development Permit." Under the 1971 Regulations, such permit was not issued until the completion of the subdivision and the occupancy permit was issued.

The approved preliminary development plans contained a 15-acre lake in a swampy area of flood plain, where pine beetles had killed the trees, leaving it unsightly. The City did not want a lake and did not want any responsibility or liability for the lake. The lake was to serve as an amenity for recreational use and to improve the appearance and as an incidental detention pond for surface water run-off and sedimentation of construction mud to protect the Chattahoochee River for water quality control. The water discharged from the lake drained through a state-of-the-art siphon system. The siphon system drained water from the bottom of the lake instead of the top through a stand pipe in order to allow sedimentation to occur prior to the discharge of the water, which would prevent flooding up to the 100-year flood plain line. The design and construction of the

lake cost $300,000. The defendants did not build the lake as a detention facility within the meaning of the regulations. If the lake had not been constructed, then the flood plain where the lake was built would have been sufficient to receive any surface water run-off without detention. The 1971 Regulations did not require the construction of the lake as a detention facility. The lake was completed in July 1991. The defendants provided the City "as-built" drawings of the dam. The director for the City had been closely involved in the planning and design of the lake.

In May 1992, Major deeded the lake, the clubhouse, and the surrounding recreational lands to the homeowner's association of Riverbrooke Subdivision.

During the period from 1992 into 1995, the City approved the final subdivision plats for the five phases done in thirteen planned segments of the Riverbrooke Subdivision. Several of the final subdivision plats approved by the City showed the lake as a boundary. During the construction of Riverbrooke, the City had five different Directors of Planning and Development, who each had responsibility for approval of subdivision construction in the City and who had been familiar with all phases of the development. Between January 1 and September 31, 1992, the City issued to the defendants 151 building permits without raising any issue about the lake being used as a detention facility. By letter of December 30, 1992, the City certified that road improvements and drainage structures in Phases I, II, and III of The Summit at Riverbrooke had been constructed to City standards for the purpose of the performance bond.

On March 13, 1995, the City of Duluth approved the final plat of the completed Riverbrooke Subdivision submitted by the defendants and issued certificates of occupancy for the completed residential units. No "as-built" survey and certification of the lake was filed by the defendants pursuant to Footnote 29; however, the City approved the plans and occupancy permits nonetheless.

The City began receiving complaints in 1994 from residents of the Riverbrooke Subdivision who lived near the lake that water was backing up into the culvert behind Clearbrooke Way in which a drainage ditch carried surface water run-off into the lake. The City engineers investigated the situation and decided that the culvert under the road, through which water drained to the lake, was undersized and would not permit the free flow of drainage surface water run-off without backing up. The City's then Director of Planning and Development issued a proposed executive order mandating that Major correct the problem at his expense by installing a second culvert under the City's street. The City could not get Major to voluntarily fix what they saw as the problem in the way they wanted the problem corrected. Major refused, because Clearbrooke Way had

been previously accepted by the City in 1991 as a City street, satisfying the City standards; thus, the performance bond had been released by the City.

The City's investigation caused it to decide that no "as-built" survey and certification for the lake as a detention facility had ever been filed with the City as part of any subdivision plats under the 1992 Regulations. This was a way to force Major to correct the problem to the satisfaction of the City's engineers, because the defendants would have to obtain the approval of such "as-built" survey and certification from the City. On June 14, 1995, the City's Director of Planning and Development demanded in writing that Major provide the City with an "as-built" certification for each of Phase I's detention facilities in compliance with the development regulations, section 8.2.8, and Footnote 29 from the initial construction plans.

Major refused to provide an "as-built" drawing and certification for the lake, because: (1) such action would require him to trespass on the lake front lots to do the survey; (2) the lake was not legally a detention facility; and (3) the regulations did not require this. The defendants took the position that they did not have to furnish the City, upon completion of the subdivision, with an "as-built" survey of the lake, because they had done so during construction. The defendants contended that such requirements had been satisfied prior to the recording of the plat.

In November 1995, the City brought an action in equity in the Superior Court of Gwinnett County to enjoin the defendants from continued violation of the City of Duluth's development regulations and to require the defendants to provide the City with an "as-built" drawing and certification for the lake. The defendants answered, denying that they were in violation of the City of Duluth development regulations, and counterclaimed, seeking a declaratory judgment that certification of the lake was not required and seeking damages. The trial court bifurcated the issues and tried the injunctive relief and declaratory judgment issues at a bench trial. On November 6, 1997, the trial court entered a judgment denying the City's request for injunctive relief and granted the defendants a declaratory judgment adverse to the City. The City filed its notice of appeal.

1. Plaintiff's first enumeration of error is that the trial court erred in its determination that the 1971 Subdivision Regulations for the City of Duluth applied to the construction of the lake in Riverbrooke Subdivision. We do not agree.

The City of Duluth contended that the 1992 Regulations grandfathered only completed subdivisions so that Riverbrooke Subdivision, which had been commenced under the 1971 Regulations, now was subject to the new regulations. The City contends that this is so because, on the adoption date of January 13, 1992, Riverbrooke

Subdivision did not occupy the status of "[a]ny subdivision or other project for which a valid and complete application for a Development Permit shall have been received prior to the effective date of these Regulations." See Section 14.1.2. However, the City's contentions ignore the fact that the City had given preliminary approval to the entire Riverbrooke Subdivision in 1991 under the 1971 Regulations, prior to the adoption of the 1992 Regulations on January 13, 1992. It appears that the 1992 Regulations were written to expressly exclude from "grandfathering" any development in progress, i.e., Riverbrooke Subdivision, because the "grandfather" clause excluded any development under the 1971 Regulations that did not have a final permit of completion, which was only issued when the subdivision was finished.

A governmental entity cannot make laws and regulations retroactive where a person has acquired a vested property interest. The City argues that Riverbrooke Subdivision was developed in 13 separate and distinct phases and most of such phases occurred after January 13, 1992. However, there were actually only five phases that had two or three lot price range segments within each phase: Phase I Riverbrooke — The Plantations, The Summit, and Lake Villas (7/18/91-8/29/91); Phase II Riverbrooke — The Plantations (8/29/91), Lake Villas (2/18/92), and The Summit (5/19/92); Phase III Riverbrooke — The Summit (9/11/92), and The Plantations (9/11/92); Phase IV Riverbrooke — The Summit (7/7/93), and The Plantations (7/7/93); and Phase V Riverbrooke — The Summit (6/13/94), and The Plantations (3/13/95). The only issue of non-compliance involves the lake, which was built under Phase I. Phase I was approved July 18, 1991; the land-disturbance permit for Phase I was issued February 26, 1991; and Phase I was completed or in progress when the new regulations were implemented. The entire subdivision had an integrated development plan which was approved by the City prior to its commencement and prior to the adoption of the 1992 Regulations.

The defendants allowed the Riverbrooke Subdivision to be annexed into the City of Duluth at the urging of the City officials and Major and Riverbrooke willingly incurred a higher ad valorem burden with the understanding and expectation that the development would be under the 1971 Regulations. All of the engineering and development costs were based upon the 1971 Regulations. Such expectation, in submitting the entire future subdivision development in phases, was based upon the 1971 Regulations in 1991. The annexation of the Riverbrooke Subdivision and the 1991 approved developmental plans constituted a substantial change of position and an expenditure in reliance upon the existing regulations, so that the defendants acquired a vested property right. See *WMM Properties v. Cobb County*, 255 Ga. 436, 438 (1) (c) (339 SE2d 252) (1986); *DeKalb*

*County v. Chapel Hill*, 232 Ga. 238 (205 SE2d 864) (1974).

"A landowner has a right to develop the property pursuant to a development plan duly approved by the [municipal director of planning and development] pursuant to powers delegated to it by the [mayor and council of the municipality] even though the development plan [was not final within the existing developmental regulations], where the landowner has expended large sums of money in furtherance of the development and has [granted to the homeowner's association the lake, clubhouse, and surrounding land with amenities] in reliance upon its approved development plan." *WMM Properties v. Cobb County*, supra at 439; see also *DeKalb County v. Chapel Hill*, supra at 244.

Such vested property right arises where there was a substantial change of position in reliance with legal or economic liability resulting through expenditures based upon the probability of approval of the development plan, and there was conditional or tentative approval; where assurances and representations made by governmental authority, or by someone with the delegated authority to approve the preliminary developmental plan; that the plans would allow such development under something other than a final plan; or where regulations existing at the time of submission of the plan of development supported such developmental plan. See *WMM Properties v. Cobb County*, supra at 438; see also *Cannon v. Clayton County*, 255 Ga. 63 (335 SE2d 294) (1985); *Barker v. County of Forsyth*, 248 Ga. 73, 76 (281 SE2d 549) (1981); *Spalding County v. East Enterprises*, 232 Ga. 887 (209 SE2d 215) (1974). Thus, the defendants acquired vested property rights under the preliminary developmental plan filed under the 1971 Regulations and, as a matter of law, such vested rights in the entire Riverbrooke Subdivision were "grandfathered" from the effect of the subsequently adopted 1992 Regulations.

2. The City's second enumeration of error is that the trial court erred in determining that the City of Duluth subdivision regulations did not require the defendants to submit an "as-built" certification for the lake in Riverbrooke Subdivision. We do not agree.

Neither Article IX nor Article VII (C) of the 1971 Subdivision Regulations defines what a "detention pond" is or deals with lakes. The defendants provided "as-built" data for three detention ponds constructed in Riverbrooke Subdivision, which had no purpose other than use as detention ponds, which Footnote 29 refers to. Although the defendants provided substantial data in the preliminary plans as to the 15-acre lake, no "as-built" data or survey was ever furnished pursuant to Footnote 29 of such plans, because Footnote 29 referenced the three detention ponds and not the lake. Moreover, Footnote 29 did not have the effect of a regulation, and strict compliance, sub-

sequent to approval of the plan, was waived by the City. Further, the lake only incidentally served any detention function by collecting water and controlling the rate and volume of discharge. Since the pre-existing flood plain where the lake was built was extensive enough to function in detention of surface water run-off without the construction of a detention facility, then the regulations did not require the construction of such facility. Because the lake only incidentally provided detention capacity, the lake was not converted into a "detention facility" subject to the regulations. It was such reasons that caused the trial court to find that the lake is not a detention facility as a matter of fact. The initial survey and hydrology data for the lake were substantially the same as the "detention pond record drawings (as-built)," because the data would be substantially the same.

Further, there was nothing in the 1971 Regulations regarding a lake; it only regulated the three detention ponds. The detention ponds for the Summit controlled most of the water which fell there. However, the water run-off from the Villas ran into the lake, but this did not make it a detention facility, although it incidentally served such purpose, because such water did not require detention with the size of the flood plain. The City really sought to regulate, after acceptance, the Clearbrooke Way culvert by requiring an "as-built" survey and certificate. The City by now requiring such survey could now reject the survey as deficient as to the culvert size leading to the lake area, which the City had not previously regulated as a detention facility system. The real issue involved the size and number of culverts under Clearbrooke Way.

In fact, Article VII (D) (2) of the 1971 Regulations required a performance bond to be posted under which the developer would be liable for any defects in the streets and "drainage system" for one year, beginning on the date of acceptance of the streets by the City. No such action was ever commenced by the City within such period, and the City accepted the streets and drainage system in 1991 so that the drainage problem became the City's drainage responsibility and not a detention problem.

Article VII (C) provided that "cross drain pipe and pipe under roadway" had to "meet State Highway Specifications, Section 106 and 520" and not be less than 18 inches in diameter. Such City street and drainage standards were met by the defendants, and the work approved by the City before acceptance as a City street with the release of the performance bond in 1992. The defendants provided engineering studies to the City showing that with a 100-year flood limit, water would back-up culverts in some areas. To prepare the "as-built" survey and hydrology data demanded by the City would cost between $5,000 and $7,000.

While the lake may have in fact served in part as a detention facility for surface run-off water that would have entered the flood plain and may even have been designed for such purpose by the defendants' engineers, the 1971 Regulations were fully satisfied and the completed work accepted by the City, and the lake was not a detention facility under the 1971 Regulations. The 1971 Regulations provided no standards or conditions for detention facilities of this size, and the preliminary plans for Phases I through V gave detailed descriptions of how storm drains and erosion control were to be dealt with in conjunction with the lake as to inflow sizing. The size and number of culverts under the streets were street design and drainage problems, not detention problems. See 1971 Regulations Art. VII (C). Moreover, neither the 1971 Regulations nor Footnote 29 gave the City the right to determine the size of the intake in excess of three feet. Footnote 29 was a general note that applied to the three detention ponds only, not to the lake.[1]

Here, the City was not entitled to the relief sought, thus such finding did "not affect the substantial rights of the parties." OCGA § 9-11-61; see also *Miller Grading Contractors v. Ga. Fed. Sav. &c. Assn.*, 247 Ga. 730, 734 (3) (279 SE2d 442) (1981). The size and number of the culverts under Clearbrooke Way were not detention pond issues, but street/drainage issues under Art. VII (C) of the 1971 Regulations and were approved by the City as constructed in 1991 and the City released the performance bond 12 months after acceptance of Clearbrooke Way.

3. The plaintiff's third enumeration of error is that the trial court erred in its determination that the City of Duluth was estopped from requiring an "as-built" certification of the lake in Riverbrooke Subdivision. We do not agree.

The City misplaces its reliance upon *Corey Outdoor Advertising v. Bd. of Zoning Adjustment &c.*, 254 Ga. 221 (327 SE2d 178) (1985) (*"Corey"*), because the zoning ordinance in that case clearly and unambiguously *prohibited* the construction of a massive billboard within a specified distance of any of the historic district boundaries and described how this was to be measured. In *Corey*, the sign company had no right to rely upon the erroneous interpretation of the inspector, who had no authority to authorize a larger sign permit in clear violation of the prohibition of the ordinance. This is because the inspector, a mere employee, had no power or authority to disregard the plain language of the ordinance, and the issuance of the illegal permit was unauthorized, i.e., ultra vires.

---

[1] Thus, the trial court's factual finding that the lake was not a "detention facility" could not be reversible error.

Here, however, the Director had no regulation standards to apply but had the delegated power and authority from the City to make such discretionary decisions on the City's behalf and to bind it by his actions. Second, while estoppel, generally, would not arise to frustrate a governmental function publicly expressed by the plain language of the ordinance prohibiting an act or omission, in this case, however, the governmental policy was *not* frustrated but was furthered by the acts or omissions of the Director in approving the final plan and occupancy permit without requiring compliance with Footnote 29, which the Director had authority to waive. The City delegated such powers to him to exercise in his discretion. While we have held that the 1992 Regulations are not applicable, the Director believed that he had the power to enforce them. He chose not to require the "as-built" survey and certification before the final plan was approved and the occupancy permits issued under Footnote 29.

The defendants should not be compelled to submit the certification and survey — over six years after relinquishing ownership of the lake, over three years after the final plan and certificate of occupancy had issued, and nearly three years after suit — when there was substantial compliance by the defendants, and only Footnote 29 of the preliminary plan created any expectation of the filing of the "as-built" survey. The real reason behind the City's demand was to force the defendants to install a second culvert under Clearbrooke Way, a City street, to increase the inflow of water into the lake. Therefore, under the facts of this case, estoppel of the City of Duluth was appropriate, because such acts or omissions regarding Footnote 29 were not the exercise of an ultra vires act, but the exercise by the Director of discretionary delegated police powers of the City within the scope of his authority. *City of Atlanta v. Black*, 265 Ga. 425, 428-429 (457 SE2d 551) (1995); *Quillian v. Employees' Retirement System of Ga.*, 259 Ga. 253, 254-255 (4) (379 SE2d 515) (1989); *City of Summerville v. Ga. Power Co.*, 205 Ga. 843 (2) (55 SE2d 540) (1949); cf. lack of authority *City of Warner Robins v. Rushing*, 259 Ga. 348, 349 (381 SE2d 38) (1989); *Corey*, supra at 224.

4. The City's fourth enumeration of error is that the trial court erred in denying the City of Duluth's request for injunctive relief. We disagree.

It must be remembered the maxims of equity that applied when the City of Duluth sought injunctive relief in equity were "[h]e who would have equity must do equity," and "[e]quity gives no relief to one whose long delay renders the ascertainment of the truth difficult." OCGA §§ 23-1-10; 23-1-25. The City had unclean hands when it (1) sought to enforce the 1992 Regulations against the defendants when they had vested rights under the 1971 Regulations; (2) sought to enforce the "as-built" survey for an ulterior motive; and (3) sought

to enforce Footnote 29 as if the City had the power and authority to do so under the 1971 Regulations. The City slept on any rights under Footnote 29 and approved the final plans and occupancy, despite such alleged rights under Footnote 29, when there had been substantial compliance. See OCGA § 23-1-10; *Partain v. Maddox*, 227 Ga. 623 (182 SE2d 450) (1971). Further, the City of Duluth delayed requesting an "as-built" survey for over three years and then did not ask for it until after the occupancy permits had been granted. *Welch v. Welch*, 215 Ga. 198 (109 SE2d 757) (1959); *Bleckley v. Bleckley*, 189 Ga. 47 (5 SE2d 206) (1939).

Also, the City of Duluth had an adequate remedy at law, an action for declaratory judgment. The existence of such adequate legal remedy would deprive the superior court of subject matter jurisdiction to grant equitable relief in this case. See OCGA § 23-1-4; *Housing Auth. v. MMT Enterprises*, 267 Ga. 129 (1) (475 SE2d 642) (1996); *Thomas v. Mayor &c. of Savannah*, 209 Ga. 866 (4) (76 SE2d 796) (1953). The City's action was for a mandatory, permanent equity injunction against the defendants to compel them to file the "as-built" survey and to obtain certification from the City. The City's action was not an ancillary legal injunction to maintain the status quo under the Declaratory Judgment Act. See OCGA §§ 9-4-1; 9-4-3; see also *Todd v. Conner*, 220 Ga. 173, 175-176 (1) (137 SE2d 614) (1964); *Milwaukee Mechanics Ins. Co. v. Davis*, 204 Ga. 67 (48 SE2d 876) (1948); *Shippen v. Folsom*, 200 Ga. 58, 67-68 (1) (35 SE2d 915) (1945); *Grange Mut. Cas. Co. v. Riverdale Apts.*, 218 Ga. App. 685, 686 (463 SE2d 46) (1995); *Tenn. Farmers Mut. Ins. Co. v. Wheeler*, 170 Ga. App. 380 (1) (317 SE2d 269) (1984); *Ayers v. Mobley*, 163 Ga. App. 239, 240 (1) (293 SE2d 470) (1982).

Moreover, even assuming that the trial court had facts that supported the exercise of equity jurisdiction in the superior court, injunctions should be granted cautiously and only if there was no adequate remedy at law; if the evidence showed that the plaintiff would suffer irreparable harm; and, in balancing the harm to the parties, if the superior court in the exercise of its discretion found that equity demanded the grant of the injunction. Absent these factors, the trial court should deny an injunction. OCGA §§ 9-5-1; 9-5-8; *Staples v. Ladson*, 256 Ga. 621 (351 SE2d 448) (1987); *Ellis v. Ga. Kraft Co.*, 219 Ga. 335 (133 SE2d 350) (1963); *Pattison v. Farkas*, 180 Ga. 798 (180 SE 831) (1935). Here, plaintiff failed to show by a preponderance of the evidence that it was entitled to injunctive relief and did not show irreparable harm to the City; the City alleged irreparable harm to other property owners. *Tarver v. Silver*, 180 Ga. 124 (178 SE 377) (1935). The trial court must, in the exercise of sound discretion, weigh and balance the convenience of the parties. *Davies v. Curry*, 230 Ga. 190 (196 SE2d 382) (1973); *Jones v. Lanier Dev. Co.*,

188 Ga. 141 (2 SE2d 923) (1939). The appellate court will not interfere with the grant or denial of injunctive relief, because it is an exercise of trial court discretion, absent a manifest abuse of discretion. *Slautterback v. Intech Mgmt. Svcs.*, 247 Ga. 762 (279 SE2d 701) (1981). In this case, the evidence was in dispute. Therefore, it was appropriate for the trial court to exercise discretion, and there has been no evidence of a manifest abuse of such discretion or error of law. *Smith v. Mid-State Nurses*, 261 Ga. 208 (403 SE2d 789) (1991); *West v. Koufman*, 259 Ga. 505 (384 SE2d 664) (1989).

*Judgment affirmed. McMurray, P. J., and Blackburn, J., concur.*

DECIDED JUNE 22, 1998.

*Thompson & Sweeny, Virgil L. Thompson, Jr., Paul E. Andrew,* for appellant.

*Webb, Tanner & Powell, Robert J. Wilson,* for appellees.