### A04A0186. BOSWELL et al. v. PRIMARY CARE PROFESSIONALS, P.C. et al.
#### (594 SE2d 725)

ELDRIDGE, Judge.

The Superior Court of Cherokee County granted summary judgment to Dr. David E. Fields, in Dr. Thomas Boswell and Dr. Denville Darnell's ("plaintiffs") action against Primary Care Professionals, P.C. ("Primary Care") and its corporate president, Fields, individually, based upon Primary Care's alleged breach of the terms of a contract to purchase plaintiffs' medical practice. The court found that the plaintiffs failed to pierce the corporate veil so as to create liability in Fields individually for Primary Care's alleged breach of contract. Plaintiffs appeal, claiming the trial court erred in its finding because Primary Care was the "alter ego and instrumentality" of Fields, and

---

[6] 232 Ga. App. 450 (501 SE2d 241) (1998).
[7] Id. at 451 (1).
[8] OCGA § 17-5-30 (b).

he used such corporate entity as a means to defraud plaintiffs and evade the obligations of the sales contract. The record shows these contentions to be meritless. Accordingly, we affirm the judgment of the court below.

Plaintiffs formed the Tate Community Clinic ("Tate Clinic") and practiced there for 40 years. In 1993, they entered into an "Agreement for Sale of Professional Practice" ("agreement") with Primary Care, a corporation formed solely for the purpose of purchasing the Tate Clinic. At the time of the purchase, Fields was vice president of the corporation and later, in 1996, became its president.[1] The total sales price under the agreement was $300,000, with $50,000 to be paid at closing and the balance of $250,000 to be paid over ninety-six months at eight percent interest.[2] A note was executed reflecting this financial arrangement. Simultaneously, a security agreement was executed in favor of plaintiffs and covering as collateral "all that property transferred to [Primary Care] under the terms of that certain Agreement of Sale of Professional Practice, including, but not limited to all inventory, accounts receivable, furniture and fixtures."

Fields was never employed by Primary Care and did not practice at the Tate Clinic.[3] In his deposition, it was established that Tom Cartledge with Oakside Investments was hired as an administrator to handle corporate and financial matters for Primary Care. Fields deposed that he was unaware of the details of Primary Care's corporate and financial situation because he left such matters up to Cartledge and others. Fields testified that he attended regular shareholders meetings for Primary Care, but he remembered nothing specific about them. He stated, "I have signed a lot of corporate minutes, I don't remember when or what the circumstances were." At no time did Fields receive compensation, income, or, apparently, any form of benefit from Primary Care "because they just never turned a profit."

Primary Care operated the Tate Clinic for four years. During that time, two pieces of equipment, an x-ray machine and a sigmoidoscope, were leased. The clinic building was leased from the Tate Community Association. In 1997, plaintiffs were informed that Primary Care was experiencing financial difficulties; payments under the note became untimely, as did the rent for the building occupied by the clinic.

---

[1] Primary Care's president at the time of purchase was Dr. James Harvey who was a named defendant in this action. The claims against Harvey were later dismissed.

[2] Also under the agreement, plaintiff Darnell was to continue working at the Tate Clinic at the rate of $2,000 per week plus a payment of $4,000 per quarter, as well as 50¢ for each dollar of net cash revenue exceeding $240,000 each year; plaintiff Boswell had the option to work at the Tate Clinic on a contract basis at $833 per day or to practice at the clinic on the same basis as Darnell with identical compensation.

[3] Fields practices at Canton Family Care, P.C.

Three months prior to the expiration of Primary Care's lease and while still employed by Primary Care, plaintiffs began negotiations with Mountainside Medical Center in Jasper ("Mountainside") to run the Tate Clinic in the clinic building. Plaintiffs would continue practicing at the clinic under the employment of Mountainside, and "it was going to be run just like it had been in the past." Weeks before the expiration of Primary Care's lease for the clinic building, plaintiffs conferred with the clinic's landlord, members of the board of the Tate Community Association. The members of the board,

were wanting to know — to try to decide what they were going to do since they couldn't — they were having trouble getting their rent and they wanted to decide whether they were going to let them [(Primary Care)] have another lease or not.

Plaintiffs discussed with the board the rental of the clinic building to Mountainside. The Tate Community Association decided not to permit Primary Care to renew its lease of the clinic building. Mountainside immediately rented the building from the Association, and as the plaintiffs deposed, "they just came in and took the thing over" so that the clinic "never closed." Mountainside utilized the assets of the clinic that remained after Primary Care moved out. Plaintiff Darnell deposed that such assets belonged to the Tate Community Association and consisted of "examining tables and chairs and lab work, lab equipment," basically about "the same equipment, then, that [plaintiffs] sold to Primary Care Professionals." Plaintiffs began immediate employment with Mountainside at the same salary Primary Care was paying them. Neither plaintiff identified any patient of the Tate Clinic that was lost through the transfer of operation from Primary Care to Mountainside.

Primary Care ceased both its operation and its payments under the note. Fields formed a new corporation, Parkway Medical Center, P.C. ("Parkway") and hired an administrator to oversee corporate and financial matters. Parkway moved into a new building, the Parkway Medical Center. Fields deposed that he formed Parkway because he wanted "to practice medicine and render medical care to patients." He testified that it was his belief "the financial situation of [Primary Care] was such that it was not feasible or tenable to continue it." Primary Care's two pieces of leased equipment, the sigmoidoscope and x-ray machine, were taken to Parkway. One doctor formerly employed by Primary Care was hired by Parkway. Primary Care's patient medical files/charts were transported to Parkway, although the patients, themselves, were not necessarily to be treated at Parkway; "[j]ust that the medical files are there." Fields deposed that he

had no knowledge of whether any patients formerly treated by Primary Care at the Tate Clinic were now being treated at Parkway, "not being involved in the running of the clinic or the conduct of the doctor[s]." He stated that whether a former Primary Care patient was being treated at Parkway would be reflected in Parkway's files by a current medical visit. Neither plaintiff was able to identify any specific item transferred to Primary Care in 1993 as collateral at the time of the purchase that had been removed by Primary Care. It is undisputed that Fields never personally removed anything from the Tate Clinic, and neither the plaintiffs nor anyone else has ever seen Fields with any item removed from the clinic. *Held*:

Plaintiffs contend that Fields used Primary Care as an "alter ego" to avoid contractual liability and defraud the plaintiffs as creditors. Relying solely on Fields' deposition testimony to support their claims, plaintiffs direct our attention to testimony that Primary Care ceased operation because of its financial condition and inability to pay plaintiffs. They also point to Fields' lack of knowledge about Primary Care's corporate and financial operations, contending that such evidence shows that Primary Care was simply a "sham" corporation. Finally, plaintiffs complain about "commingled assets" because Fields' corporation, Parkway, allegedly uses certain assets that belonged to Primary Care. We find no merit to any of plaintiffs' contentions.

> An inherent purpose of incorporation is insulation from liability. A corporation possesses a legal existence separate and apart from that of its officers and shareholders so that the operation of a corporate business does not render officers and shareholders personally liable for corporate acts.[4]

In this case, Fields was not a party to the contract between plaintiffs and Primary Care. His only involvement was as a corporate officer. Plaintiffs have produced no evidence showing that the debt to the plaintiffs was Fields' debt rather than Primary Care's corporate debt.[5] They have not shown that Primary Care's cessation of business was for the purpose of avoiding its debt rather than a necessity engendered by the loss of the lease of the clinic building coupled with a lack of capital to continue operating.

> [F]or undercapitalization of a corporation to justify piercing the corporate veil, it must be coupled with evidence of an

---

[4] (Citation and punctuation omitted.) *Commonwealth Financial Corp. v. Sherrill,* 197 Ga. App. 403 (1) (398 SE2d 438) (1990).

[5] See id.

intent at the time of the capitalization to improperly avoid future debts of the corporation. There is no evidence of such intent in this case.[6]

Indeed, there is no evidence to show that it was Fields' idea to discontinue operating Primary Care, as opposed to a recommendation from the corporate administrator, Cartledge, due to financial constraints. In that regard, the record shows that Fields had nothing to do with the corporate or financial operations of Primary Care because Cartledge handled those matters. Thus, plaintiffs' reliance on those portions of Fields' deposition demonstrating lack of corporate knowledge is misplaced. From the record, it appears questions about Primary Care's corporate and financial structure were asked of the wrong person. Plaintiffs failed to depose corporate administrator Cartledge. As a result, there is no evidence of record to demonstrate that Primary Care was simply a "sham" corporation. And certainly Fields' negligible corporate involvement precludes the operation of Primary Care as his "alter ego," which required a showing "that there is such unity of interest and ownership that the separate personalities of the corporation and the owners no longer exist."[7]

Finally, there is no evidence that Fields "disregarded the separateness of legal entities [Primary Care and Parkway] by commingling on an interchangeable or joint basis or confusing the otherwise separate properties, records or control."[8] The two corporations, Primary Care and Parkway, were not in existence at the same time. While plaintiffs complain about the removal of Primary Care's patient files to Parkway, the evidence is that Fields did not remove such records. And even if patient medical files can be considered an "asset" owned by a medical practice — as opposed to documents personal to patients and deserving of privacy and protection by the practice that compiled them[9] — no evidence shows either that Primary Care's patient files are being utilized by Parkway or that Primary Care's former patients are now being treated by Parkway so as to establish a commingling of such "assets."

Unpersuasive, also, is plaintiffs' complaint that Parkway makes use of certain equipment and employees formerly belonging to or working for Primary Care. Even if this assertion is true, plaintiffs fail to demonstrate how such use benefits Fields, personally. In fact, it appears that Fields hired an administrator to handle the corporate

---

[6] *Hickman v. Hyzer*, 261 Ga. 38, 39-40 (1) (401 SE2d 738) (1991).

[7] *Dews v. Ratterree*, 246 Ga. App. 324, 327, n. 3 (540 SE2d 250) (2000).

[8] (Citation and punctuation omitted.) *Fuda v. Kroen*, 204 Ga. App. 836, 837 (1) (420 SE2d 767) (1992).

[9] See OCGA §§ 24-9-40 (a); 24-9-41; 24-9-42.

affairs of Parkway, just as he had done with Primary Care, rendering his involvement with Parkway far too limited to support plaintiffs' premise that Fields, personally, commingled the assets of Primary Care and Parkway for his own benefit.

> When litigated, the issue of "piercing the corporate veil" is a jury question. For the issue to be submitted to a jury[, however,] there must be evidence that the corporate arrangement was a sham, used to defeat justice, to perpetrate fraud or to evade statutory, contractual or tort responsibility.[10]

In this case, there was no evidence showing that Fields disregarded the separation of the corporate entity by commingling assets or abusing the corporate form. The trial court's grant of summary judgment to Fields, individually, was proper.

*Judgment affirmed. Ruffin, P. J., and Adams, J., concur.*

DECIDED FEBRUARY 11, 2004.

*Hasty, Pope & Ball, William G. Hasty, Jr., Jonathan A. Pope, Marion T. Pope, Jr.*, for appellants.
*Flint & Connolly, Douglas H. Flint*, for appellees.

---

[10] (Citations and punctuation omitted.) *Derbyshire v. United Builders Supplies*, 194 Ga. App. 840, 844 (2) (a) (392 SE2d 37) (1990).