A05A0279, A05A0280. BISHOP EDDIE LONG MINISTRIES, INC. et al. v. DILLARD et al.; and vice versa.
(613 SE2d 673)

BLACKBURN, Presiding Judge.

In these related cases involving ongoing disputes about easements to use a lake, Bishop Eddie Long Ministries, Inc., and Richard and Susan Adle sued G. Douglas Dillard, John Cowart, Robert J. Rutland, and Hunt Valley, Inc., for nuisance and trespass arising out of the defendants' decisions to no longer maintain a dam and to drain a lake on which plaintiffs owned lakefront property. Defendants counterclaimed for trespass, conversion, and nuisance arising out of plaintiffs' harvesting of defendants' trees and efforts to refill the lake by plugging up the dam's drainage pipe. A jury awarded damages to both sides, including attorney fees and punitive damages. Both sides have appealed. For the reasons which follow, we affirm in both cases.

Construed in favor of the verdict, the evidence shows that in August 1977, Robert J. Rutland purchased 216 acres in DeKalb County, which included a large lake in the middle of the property impounded by an earthen dam. That same day, Rutland sold a 120-acre parcel of the property to a joint venture called Hooker/Barnes, which parcel included the lower half of the lake and the entire dam.

---

To secure Hooker/Barnes's debt to Rutland arising out of the sale, Hooker/Barnes gave Rutland a security deed on the 120-acre parcel. Hooker/Barnes and Rutland also entered into a "Reciprocal Easement Agreement" that same day regarding the maintenance of the lake, in which agreement the parties granted each other (and their successors in title) easement rights over the whole lake and agreed to share the costs of maintaining the lake. Duly recorded in the DeKalb County real estate records, this agreement provided that it terminated upon the satisfaction of the security deed from Hooker/Barnes to Rutland.

In June 1983, Rutland conveyed 49 acres of the property he had retained to Monteagle, Inc., which acreage included most of the upper half of the lake and surrounding property. Monteagle in turn subdivided the forty-nine-acre parcel and in March 1984 sold a five-acre plot to Richard and Susan Adle. The deed incorporated by reference a recorded plat, which plat showed the lake and portrayed that the five-acre plot not only fronted the lake but also included some property underlying the lake. The Adles built a home with a view of the lake, which they enjoyed for some years.

On June 6, 1984, Hooker/Barnes sold its undeveloped 120-acre parcel (including the lower half of the lake and the entire dam) to Hunt Valley, Inc. ("HVI"), a corporation formed only days earlier on June 1, 1984. As part of the transaction, the security deed from Hooker/Barnes to Rutland was satisfied, terminating the Reciprocal Easement Agreement. HVI subdivided the property and in September 1984 sold a 19-acre plot to G. Douglas Dillard. The deed referenced a recorded plat, which displayed a portion of the lake and showed that the 19-acre plot included not only some land underlying the lake but also a small portion of the toe of the dam. Dillard built a home on this plot, which he financed through a bank. Nine years later in December 1993, the bank foreclosed on the mortgage and obtained title to the property. The bank immediately sold the property to David Lee, who gifted the property to his wife. In March 1998, Mrs. Lee sold the property to Bishop Eddie Long Ministries, Inc. ("BEL"), with the deed again referencing the recorded plat showing the lake and dam.

Over the years, the dam deteriorated to the point that the Department of Natural Resources ("DNR") determined that the dam was not in compliance with regulatory standards and was therefore unsafe to impound water if there were residences downstream. In March 1992, the dam was damaged, leaving an open drainage pipe; because of various natural obstructions that at times occluded the drainpipe, the lake over the next eight years sometimes filled up and sometimes drained. Evidence showed that the lake was substantially full when BEL viewed and purchased the property in March 1998. It

drained and filled up somewhat thereafter. Although complaints were made to HVI, it did nothing.

In March 2000, BEL and Mr. Adle, wholly without permission from HVI, hired a contractor to plug up the drainage pipe with concrete and to correct two of the minor (but none of the major) problems with the dam, including the removal and sale of hundreds of trees from the dam's downstream slope. The lake filled up again.

In February 2001, HVI discovered that the lake had refilled and took immediate steps to drain the lake to protect downstream residences. HVI hired a contractor to cut a notch in the dam so as to place siphon machine pumps closer to the water to siphon the water out of the lake. The machines then began draining the lake.

At this point, BEL and the Adles filed the present lawsuit to stop the draining of the lake and to recover damages for trespass and nuisance. Plaintiffs sought to pierce HVI's corporate veil and also prayed to recover attorney fees and punitive damages. The named defendants initially included Monteagle, HVI, and HVI's primary shareholders (Rutland, Cowart, Probst, and Dillard). Plaintiffs dismissed Monteagle and Probst with prejudice. HVI counterclaimed, seeking to recover damages for plaintiffs' (a) alleged unlawful trespass and creation of a nuisance when they plugged up the dam, and (b) conversion of HVI's timber. HVI also requested attorney fees and punitive damages.

Plaintiffs initially sought an interlocutory injunction to enjoin the draining of the lake. Based on its preliminary review of the evidence and the equities of the parties, the trial court granted the injunction. Pending trial, the court enjoined HVI from draining the lake but ordered HVI to keep the lake level seven feet below the notch in the dam as required by an administrative order from the DNR that focused on the possibility of the dam overflowing and collapsing. Defendants appealed the interlocutory injunction order to this Court, and we affirmed. *Dillard v. Bishop Eddie Long Ministries*[1] (*"Dillard I"*).

A jury trial ensued. At the close of the evidence, the trial court granted in part and denied in part the parties' respective motions for a directed verdict. The plaintiffs' claims to survive this order were the Adles' claim against defendants for nuisance, BEL's claims against defendants for trespass and nuisance, plaintiffs' claims for attorney fees and punitive damages, and their claim to pierce the corporate veil. Surviving counterclaims included HVI's claims against BEL and Mr. Adle for trespass, nuisance, conversion, attorney fees, and punitive damages.

---

[1] *Dillard v. Bishop Eddie Long Ministries*, 258 Ga. App. 507 (574 SE2d 544) (2002).

The jury found in favor of the individual defendants with regard to the direct claims against them and found in favor of HVI with regard to BEL's claim for trespass. The jury then found against HVI with regard to plaintiffs' claims for nuisance, attorney fees, and punitive damages. However, the jury found the corporate veil had been pierced, and thus the court entered judgment against all the individual defendants for the damages awarded against HVI. Regarding the counterclaim, the jury found against BEL and Mr. Adle on all counts and awarded HVI compensatory and punitive damages as well as attorney fees. Exercising its equity jurisdiction, the trial court declined to enter a permanent injunction to enjoin HVI from draining the lake or from removing the dam but did note that such actions might subject HVI to further damages. The court denied defendants' subsequent motions for new trial and for judgment notwithstanding the verdict. Plaintiffs appeal in Case No. A05A0279, and defendants cross-appeal in Case No. A05A0280.

## Case No. A05A0279

1. In their respective first enumerations, plaintiffs and defendants both argue on appeal that the trial court erred in its rulings on the nature, extent, and scope of the plaintiffs' property interests. The trial court held that BEL had an irrevocable easement to the lake and thus could maintain both trespass and nuisance claims against HVI. The Adles did not have such an easement (since Hooker/Barnes, the owner of the dam at the time of the Adles' purchase, did not sell the Adles their property) but could maintain a nuisance action against HVI for the creation of the mudhole. We agree with the trial court.

Common law determined the extent and scope of the plaintiffs' respective property rights to the lake at the time each plaintiff purchased its respective lot. Even though the Reciprocal Easement Agreement purported to define those rights, that recorded agreement terminated by its own terms long before the relevant events occurred in this lawsuit. Accordingly, that agreement was irrelevant in determining the parties' property rights. See *Patterson v. Powell*.[2]

As we explained in *Dillard I*, supra at 510 (2), the Supreme Court of Georgia in *Walker v. Duncan*[3] set forth Georgia common law regarding easements to lakes. *Walker* held that a developer could not interfere with the lot owners' use of a lake area designated on a subdivision plat, because the lot owners had acquired an irrevocable easement in that area. Id. *Walker* explained:

---

[2] *Patterson v. Powell*, 257 Ga. App. 336, 338 (571 SE2d 400) (2002).
[3] *Walker v. Duncan*, 236 Ga. 331 (223 SE2d 675) (1976).

It is well-established that where a developer sells lots according to a recorded plat, the grantees acquire an easement in any areas set apart for their use. An easement acquired in this manner is considered an express grant, and is an irrevocable property right. The rationale is that the grantees of the property have given consideration for its enhanced value in the increased price of their lots.

(Citation omitted.) Id. at 332. Similarly, in *Higgins v. Odom*,[4] several buyers bought lots in a subdivision pursuant to a plat showing a lake owned by the developer. When the lake's subsequent owner sought to exclude the buyers from using the lake, the Supreme Court (citing *Walker*, supra) held that the adjoining property owners had acquired an irrevocable easement in the lake, and that the lake's new owner could not interfere with that easement. *Higgins*, supra at 310. See *Smith v. Gwinnett County*.[5]

Summarizing these and other cases, *Patterson*, supra at 337-339, concluded that landowners who purchased from a developer pursuant to a subdivision plat showing a lake owned by the developer acquired an express and implied easement to the lake, with which neither the developer nor the lake's subsequent owner could interfere. Even though the lake area was never designated a "common area," the easement still arose based merely on the fact that the developer-owned lake "was designated on a subdivision plat and the lots were sold according to that plat; that is sufficient." Id. at 338-339. See *Doughtie v. Dennisson*.[6]

Here, Dillard purchased his 19-acre lot from HVI, the developer that owned the dam and the impounded lake as shown on the referenced plat. Thus, he acquired an irrevocable easement to the lake (and therefore the dam), which became appurtenant to his lot. See *Dillard I*, supra at 511 (3). BEL was the successor in title to that lot and its appurtenances pursuant to a deed that also referenced the plat portraying the lake and dam, which dam HVI continued to own. Thus, BEL acquired an irrevocable easement to the lake and dam, enforceable against HVI, which easement he could claim was trespassed when HVI notched the dam and partially drained the lake. The mudhole created on and next to his property could also serve as the basis for the nuisance action against HVI.

On the other hand, the Adles purchased their land from Monteagle, not from HVI (which did not even exist at the time). They

---

[4] *Higgins v. Odom*, 246 Ga. 309 (271 SE2d 211) (1980).

[5] *Smith v. Gwinnett County*, 248 Ga. 882, 884 (2) (a) (286 SE2d 739) (1982).

[6] *Doughtie v. Dennisson*, 240 Ga. 299, 300 (240 SE2d 89) (1977).

certainly had an easement to the lake, which was enforceable against Monteagle (and its successors) and with which Monteagle could not interfere. But as was clear from their plat and from the land records (see *Hardage v. Lewis*[7] (purchaser is charged with every fact shown by land records)), the lower half of the lake and the dam were owned by Hooker/Barnes (a second developer), and as against this developer they acquired no easement rights. Cf. *Macon-Bibb County Indus. Auth. v. Central of Ga. R. Co.*[8] ("the depiction on a recorded plat of a rail line on property adjacent to that conveyed does not entitle the grantee to rail service *when the rail line is owned by one other than the grantor and the service is provided by one other than the grantor*") (emphasis supplied). Thus, Hooker/Barnes's conveyance of the lower lake and dam to HVI did not carry with it easement duties owing to the Adles. The Adles' trespass action against HVI was properly dismissed, while their nuisance action (which was not dependent on easement rights) for creating a mudhole on and next to their property was viable.[9]

Absent such easement rights, Mr. Adle did not have even a colorable argument for trespassing on the dam, plugging up the dam, and harvesting the trees. Nor did BEL's easement rights to the lake authorize it to plug up the dam or harvest the trees. BEL's easement rights concerned its use of the lake, not the maintenance of the dam, which by law was the duty of its owner HVI. See Ga. Comp. R. & Regs. r. 391-3-8-.10 (2004).

HVI argues that it had complete freedom under the Safe Dams Act[10] to either maintain the dam or to destroy (i.e., breach) the dam and drain the lake. HVI misapprehends the law. Although a dam owner is allowed this choice under the Safe Dams Act, this does not immunize the dam owner from any liability for breaching duties the dam owner may owe to neighboring landowners, which duties (such as not interfering with easements or not creating a nuisance) may arise contractually or under Georgia common law. See *Sawyer v.*

---

[7] *Hardage v. Lewis*, 199 Ga. App. 632, 633 (405 SE2d 732) (1991).

[8] *Macon-Bibb County Indus. Auth. v. Central of Ga. R. Co.*, 266 Ga. 281, 283 (3) (466 SE2d 855) (1996).

[9] Any contrary holdings in *Dillard I* regarding the Adles' rights are not binding here, as *Dillard I* reviewed the validity of an interlocutory injunction that was based on a preliminary evidentiary hearing and not on the more complete record of a full-blown trial. See *Sneakers of Cobb County v. Cobb County*, 265 Ga. 410 (1) (455 SE2d 834) (1995) (because a trial court in an interlocutory injunction decision does not make a final determination of the issues, "the grant or denial of an interlocutory injunction, as well as the affirmance thereof by [an appellate court], does not establish the law of the case for the trial on the merits"). For example, *Dillard I*, supra at 508, n. 3, held that HVI marketed the property to the Adles, when in fact the Adles purchased their property from Monteagle in March 1984, months before HVI even existed.

[10] OCGA § 12-5-370 et seq.; see OCGA § 12-5-377.

*Bush*[11] (developer had duty to "maintain the lake" so as to not interfere with easement rights acquired by landowners who purchased pursuant to plat showing the lake). See generally OCGA § 41-1-1 ("the fact that the act done may otherwise be lawful shall not keep it from being a nuisance").

To diminish BEL's rights, HVI also cites Rhode Island authority (*Hood v. Slefkin*[12]) for the proposition that the owner of a dam is not obliged to maintain it for the benefit of other riparian owners who benefit from the formation of an artificial pond by the erection of the dam. This opinion is not only without precedential value in Georgia, but is dissimilar based on the very text of the opinion. *Hood* distinguishes cases where the owner of the dam markets the lakefront property and receives the enhanced value. In such cases, the conveyance to the landowner "carries with it as appurtenant to the estate conveyed an easement in having prevailing conditions continued." (Citation and punctuation omitted.) Id. at 686.

The Adles argue that the "lateral support" doctrine found in OCGA § 44-9-3 applies to the maintenance of the dam by HVI. This statute refers to the duty of adjoining landowners to "the lateral support of the soil of each to that of the other in its natural state," to "the weight of walls and other burdens that may be on it," and to adjacent or adjoining common walls.[13] We fail to discern how this statute has anything to do with the maintenance of a dam to preserve a lake, and we decline the Adles' invitation to so extend this statute.

For these reasons, we affirm the trial court's rulings concerning the property rights and duties of the parties.

2. In their second enumeration, plaintiffs argue that the trial court abused its discretion in declining to enter a permanent injunction enjoining HVI from destroying or breaching the dam. We disagree.

OCGA § 9-5-8 provides: "The granting and continuing of injunctions shall always rest in the sound discretion of the judge, according to the circumstances of each case. *This power shall be prudently and cautiously exercised and, except in clear and urgent cases, should not be resorted to.*" (Emphasis supplied.) Because of this strict language and the broad discretion accorded trial courts, we are loathe to compel a trial court to enter a permanent injunction, even when the trial

---

[11] *Sawyer v. Bush*, 244 Ga. 785 (1) (262 SE2d 102) (1979).
[12] *Hood v. Slefkin*, 143 A2d 683, 687 (R.I. 1958).
[13] OCGA § 44-9-3 (a).

court finds facts that support the granting of an injunction. *City of Duluth v. Riverbrooke Properties.*[14]

Here the trial court cited at least two reasons for its decision to deny the permanent injunction. First, it found that plaintiffs' wrongful conduct in plugging up the dam and in harvesting the trees constituted unclean hands. Since "[h]e who would have equity must do equity,"[15] a trial court has good reason to deny a permanent injunction on this ground. *City of Duluth*, supra at 54-55 (4). Second, the court found that the financial burden of maintaining the dam in perpetuity was inequitable, that it was unseemly for the court to engage in protracted supervision of such a perpetual injunction, and that the animus between the parties precluded any long-term cooperation. Such factors are relevant in the trial court's weighing and balancing the convenience of the parties in the exercise of its sound discretion. See *Haygood v. Improved Order of Samaritans*[16] (court should not compel obedience over long period of time); *Greer v. Pope*[17] (protracted supervision by court undesirable). See generally *City of Duluth*, supra at 55 (4).

Based on the trial court's findings (which we must affirm if, as here, there is any evidence to support them — see *Lanier v. Burnette*[18]), we hold that the trial court did not abuse its discretion in denying plaintiffs' prayer for a permanent injunction.

3. In plaintiffs' third enumeration, they argue that the trial court erred in denying their motion for a directed verdict on HVI's counterclaim. In that counterclaim, HVI sought compensatory and punitive damages for plaintiffs' trespass, nuisance, and conversion caused by plugging up the dam and harvesting the trees. We will uphold the denial of a directed verdict motion if there is any evidence to support the challenged claims. *F. A. F. Motor Cars v. Childers.*[19]

Trespass is a wrongful interference with the right to the exclusive use and benefit of a property right.[20] Nuisance is anything that causes hurt, inconvenience, or damage to another's person or property.[21]

Plaintiffs do not contest that they trespassed on HVI's dam or that they created a nuisance by plugging the weakened dam. Rather, they argue that, in 1991, Dillard on behalf of HVI had invited them

---

[14] *City of Duluth v. Riverbrooke Properties*, 233 Ga. App. 46, 54-56 (4) (502 SE2d 806) (1998).

[15] OCGA § 23-1-10.

[16] *Haygood v. Improved Order of Samaritans*, 185 Ga. 347, 348 (3) (195 SE 164) (1938).

[17] *Greer v. Pope*, 140 Ga. 743 (2) (79 SE 846) (1913).

[18] *Lanier v. Burnette*, 245 Ga. App. 566, 571 (3) (538 SE2d 476) (2000).

[19] *F. A. F. Motor Cars v. Childers*, 181 Ga. App. 821 (1) (354 SE2d 6) (1987).

[20] OCGA § 51-9-1; *Lanier*, supra at 570 (3).

[21] OCGA §§ 41-1-1; 41-1-4.

to participate in sharing the costs of repairing the dam, and that this authorized their later decision to plug up the defective dam. Their initial decision to decline to participate in helping repair the dam, however, hardly gave them authority to change their minds nine years later and to unilaterally plug up the dam without consulting the dam's owner and without repairing all the defects in the weakened dam. Nor did this authorize them to harvest the dam's trees for their own benefit. Because evidence supported a finding that these actions were wilfully taken in bad faith, attorney fees and punitive damages were authorized.[22]

4. In plaintiffs' fourth enumeration, they contend that the trial court erred in disallowing evidence of contradicting legal positions asserted by HVI in some administrative litigation with the DNR concerning the dam's ownership and the attendant maintenance obligations. However, the court in fact did admit these contradicting statements and positions into evidence, and excluded only those that were unverified legal conclusions. Cf. *Crosby v. Cooper Tire &c. Co.*[23] (conclusory allegations in pleadings are not facts). The court's decision to exclude indirect cumulative evidence was not an abuse of its discretion. See *Dept. of Transp. v. Mendel*[24] ("[t]he admission of evidence lies in the sound discretion of the trial court").

5. In plaintiffs' fifth enumeration, they urge that the trial court erred in excluding certain pre-purchase promises made by Monteagle to Adle and others purchasing from Monteagle regarding the maintenance of the dam. We hold that three reasons show the trial court did not abuse its discretion in disallowing the statements. See *Mendel*, supra (admission of evidence in trial court's sound discretion).

First, plaintiffs sought to use these pre-1983 oral promises of Monteagle to impose obligations on HVI, which corporation did not even come into existence until 1984. Second, any pre-purchase oral promises merged into these purchasers' deeds. *P. B. R. Enterprises v. Perren.*[25] Third, the alleged promises occurred prior to the applicable four-year statute of limitation.[26]

6. In their sixth enumeration, plaintiffs allege that based on the trial court's errors in the previous five enumerations, the trial court erred in refusing to give sixteen of plaintiffs' requested jury charges. Because we have held that the trial court did not err in any of the

---

[22] See OCGA §§ 13-6-11; 51-12-5.1 (b).

[23] *Crosby v. Cooper Tire &c. Co.*, 240 Ga. App. 857, 867 (7) (b) (524 SE2d 313) (1999), rev'd in part on other grounds, 273 Ga. 454 (543 SE2d 21) (2001).

[24] *Dept. of Transp. v. Mendel*, 237 Ga. App. 900, 902 (2) (517 SE2d 365) (1999).

[25] *P. B. R. Enterprises v. Perren*, 243 Ga. 280, 282 (3) (253 SE2d 765) (1979).

[26] See OCGA §§ 9-3-30; 9-3-31.

previous five enumerations, this enumeration must also fail. Moreover, since plaintiffs fail to support this enumeration with citation of authority or argument, we deem the enumeration abandoned.[27]

*Case No. A05A0280*

7. In defendants' first enumeration in their cross-appeal, they argue that the court erred in its rulings concerning plaintiffs' property rights. For the reasons set forth in Division 1 above, this enumeration fails.

8. In their second enumeration, defendants contend that a new trial was required because the verdict was irreconcilably inconsistent. They cite *Docutronics, Inc. v. Reitman*,[28] which held: "A verdict that is contradictory and repugnant is void, and no valid judgment can be entered thereon. A judgment entered on such a verdict will be set aside. However, verdicts are to be reasonably construed and not avoided unless from necessity. The burden is upon the party attacking a verdict to show its invalidity." (Citation and punctuation omitted.)

Reasonably construed, the verdict here was not inconsistent. Rather than repairing and maintaining the dam so it could impound water, HVI created a nuisance by instead attempting to breach the dam and drain the lake. The jury accordingly awarded damages against HVI and in favor of plaintiffs. The plaintiffs trespassed on HVI's dam and created a nuisance by plugging a weak dam, and further harvested and converted trees on HVI's land. The jury accordingly awarded damages against the plaintiffs and in favor of HVI. Defendants have failed to carry their burden of showing an irreconcilable inconsistency in this verdict.

9. In their third enumeration, defendants assert that HVI cannot be held civilly liable for obeying a criminally-enforceable governmental directive. They point to the administrative directive given by the DNR some months following HVI's notching of the dam and commencement of draining the lake. This directive required that the lake level be maintained at least seven feet below the dam's notch to prevent overflowing and the possible collapse of the dam, which collapse could result in the loss of life below the dam. Defendants claim that this directive required them to maintain the nuisance for which they were sued. Defendants fail to apprehend that by not maintaining the dam in the first place, they placed themselves in the

---

[27] Court of Appeals Rule 25 (c) (2).

[28] *Docutronics, Inc. v. Reitman*, 235 Ga. App. 268, 269 (509 SE2d 348) (1998).

situation where they were required either to repair the dam immediately or to drain the lake. They made their bed, and they must lie in it. The fact that the government required them to take certain safety precautions in light of their refusal to repair the dam can hardly be a justification for creating a nuisance. See OCGA § 41-1-1 ("the fact that the act done may otherwise be lawful shall not keep it from being a nuisance"); *Sumitomo Corp. v. Deal*[29] (lawful construction of detention pond did not prevent that pond from becoming a nuisance).

10. In their fourth enumeration, defendants urge that the plaintiffs' punitive damage claims should have been dismissed as a matter of law, or reduced. The dismissal argument relies on the "forced by the governmental directive" claim rejected in Division 9 above, and therefore must fail. The reduction argument asserts that the punitive damage award (here $400,000) exceeded HVI's net worth and was therefore excessive. Significantly, defendants do not contest that the punitive damage award meets the three criteria for appellate review set forth in *BMW of North America v. Gore*[30] and *Cooper Indus. v. Leatherman Tool Group.*[31] Rather, they focus only on the argument that where the evidence shows that the punitive damage award exceeds the net worth of a defendant corporation, the award is necessarily excessive.

Defendants' argument is flawed. Defendants cite to no Georgia authority requiring that a punitive damage award be less than the net worth of the corporate defendant. Nor is this a determinative factor as set forth in the *BMW* and *Cooper* Supreme Court decisions cited above. Indeed, such a requirement would be counterintuitive, as it would encourage poor corporations to engage in reprehensible behavior with impunity. Corporate representatives could rest assured that no award would exceed the corporation's measly net worth. Similarly, a bankrupt individual with no net worth could assault his enemies at will, knowing that no punitive damages could be awarded. This is not the law. Moreover, because the corporate veil was pierced, HVI was not the only defendant responsible for the punitive damage award.

11. In their fifth enumeration, defendants argue that plaintiffs' claim to pierce the corporate veil must fail for want of evidence. Defendants urge that the evidence showed only sloppy recordkeeping

[29] *Sumitomo Corp. v. Deal*, 256 Ga. App. 703, 708 (3) (569 SE2d 608) (2002).

[30] *BMW of North America v. Gore*, 517 U. S. 559, 575 (III) (116 SC 1589, 134 LE2d 809) (1996). For example, the actual damages here were $135,000 compared to the $400,000 punitive damage award. The ratio of 3-to-1 is well within the accepted range.

[31] *Cooper Indus. v. Leatherman Tool Group*, 532 U. S. 424, 440 (III) (121 SC 1678, 149 LE2d 674) (2001).

and not a sham to defeat justice or tort, statutory, or contractual responsibility, or to perpetrate fraud, as required by *Boswell v. Primary Care Professionals*.[32]

The evidence, however, sufficed to show that HVI was a sham to avoid tort and statutory responsibility. HVI never opened or maintained a bank account to conduct its financial transactions or to pay its bills. Rather, individual shareholders would write out personal checks to pay those bills, ostensibly as "loans." This demonstrated further that the corporation was woefully undercapitalized. Furthermore, evidence showed that the corporation issued no stock, held no directors' or shareholders' meetings, filed no tax returns, kept no corporate minutes, and for a period of nine years failed to file its annual report with the Georgia Secretary of State, resulting in its administrative dissolution for that period of time. Combined with the corporation's untenable position asserted over the years to the plaintiffs and to the DNR (withdrawn during this litigation) that it did not own the dam and therefore had no responsibilities for its maintenance, this evidence authorized a jury to conclude that the corporation was a sham designed to avoid tort and statutory responsibility.

Defendants also argue that since the jury verdict exonerated the individual defendants from any liability, including punitive damages, for those claims asserted directly against them, the verdict was inherently inconsistent to the extent it made those same individual defendants liable for the damages awarded against HVI. We hold that defendants waived this issue during a conference with the court regarding the form of the special jury verdict. During that conference, the potential inconsistency asserted here was raised, and defendants waived any right to assert such an inconsistency in post-trial proceedings.

12. In their sixth enumeration, defendants contend that the court erred in its jury instructions in two respects. They claim first that the relevant factors for punitive damages as outlined in *BMW*, supra, and *Cooper*, supra, were not given to the jury as they requested. However, those factors are designed for use by an appellate court in reviewing punitive damage awards, not for use by a jury in determining that award. See *Bowen &c. Constr. Co. v. Fowler*;[33] *Time Warner Entertainment Co. v. Six Flags Over Ga*.[34]

Second, defendants complain that the jury instruction on trespass damages (jury could award cost of repair *and* difference in fair

---

[32] *Boswell v. Primary Care Professionals*, 265 Ga. App. 522, 527 (594 SE2d 725) (2004).

[33] *Bowen &c. Constr. Co. v. Fowler*, 265 Ga. App. 274, 277-278 (3) (593 SE2d 668) (2004).

[34] *Time Warner Entertainment Co. v. Six Flags Over Ga.*, 254 Ga. App. 598, 605-607 (3) (b) (563 SE2d 178) (2002).

market value) was contrary to *Ga. Northeastern R. v. Lusk.*[35] However, the jury found that HVI committed no trespass and accordingly awarded no damages for same. This argument is therefore moot. Defendants imply that this jury instruction also pertained to the calculation of damages for nuisance, an implication simply not supported by the record.

For these reasons, we affirm the judgments entered in both Case No. A05A0279 and Case No. A05A0280.

*Judgments affirmed. Miller and Bernes, JJ., concur.*

DECIDED MARCH 29, 2005 —
RECONSIDERATIONS DENIED APRIL 19, 2005 — ▮▮▮▮▮▮▮

*Francis X. Moore*, for appellants.
*Schreeder, Wheeler & Flint, David H. Flint, Jason W. Graham, Mark W. Forsling*, for appellees.

---

[35] *Ga. Northeastern R. v. Lusk*, 277 Ga. 245, 246-247 (1) (587 SE2d 643) (2003).