**SECOND DIVISION**
**MILLER, P. J.,**
**DOYLE, P. J., and REESE, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**March 8, 2018**

# In the Court of Appeals of Georgia

A17A1969, A17A1970. GEORGIA PACIFIC CONSUMER D O - 7 6 , PRODUCTS, LP v. RATNER, et al.; and vice versa.         DO-77

DOYLE, Presiding Judge.

Kirbi Ratner, Aaron Ratner, David L. McDonald, and Kathy H. McDonald (collectively, "the Plaintiffs") filed suit against Georgia-Pacific Consumer Products, LP ("GP"), to recover in nuisance, negligence, and trespass, as well as for attorney fees and punitive damages.[1] The Plaintiffs allege that GP has damaged their property and interfered with the use and enjoyment of their property as a result of its operation of a recycled paper mill plant that existed prior to construction of their homes. In response to GP's motion for summary judgment and the Plaintiffs' cross-motion for

---

[1] This is the second appearance of this case before this Court. Plaintiffs also sought class certification, which the Supreme Court of Georgia denied. *Georgia-Pac. Consumer Prod., LP v. Ratner*, 295 Ga. 524, 531 (2) (762 SE2d 419) (2014).

partial summary judgment, the trial court entered orders (1) denying summary judgment to GP on the Plaintiffs' claims for nuisance, negligence, punitive damages, and attorney fees; (2) granting summary judgment to the Plaintiffs on their motion for partial summary judgment on their nuisance claim; and (3) granting summary judgment to GP on the Plaintiffs' trespass claim. In Case No. A17A1969, GP appeals from the denial of its motion for summary judgment on the claims of nuisance, negligence, punitive damages, and attorney fees and the grant of the Plaintiffs' motion for partial summary judgment on the nuisance claim. In Case No. A17A1970, the Plaintiffs cross-appeal from the grant of GP's motion for summary judgment on the issue of trespass.

We first address whether Georgia's "right to farm" statute, OCGA § 41-1-7, bars the Plaintiffs' claims for nuisance. Concluding that it does, we next turn to whether GP operated the paper mill in a negligent manner, rendering the statutory bar inapplicable. Because we conclude that GP did not do so, we find both that the statutory bar applies and that the Plaintiffs' negligence claim fails on the merits. Finally, we grant summary judgment to GP on the Plaintiffs' claims for trespass, punitive damages, and attorney fees.

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. A de novo standard of review applies to an appeal from a [grant or] denial of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.[2]

So viewed, the record shows that these cases arise from GP's operation of a paper mill (the "Mill") in Effingham County, Georgia. The Mill was originally built in 1986 as a facility to convert waste paper into recycled tissue, towel, and napkin products for retail and commercial sale. To this day, GP continues to make paper products from mixed amounts of recycled fibers recovered from waste paper with smaller amounts of virgin fibers.

Since the Mill began operations, approximately 130 acres of the Mill's property have been used as a site for "sludge" disposal. Sludge is a byproduct of the paper recycling process that results when usable fibers are separated out from the waste paper. The separation process washes out inks, ash, clays, calcium carbonate, titanium

---

[2] (Citations and footnote omitted.) *GEICO Gen. Ins. Co. v. Wright*, 299 Ga. App. 280, 281 (682 SE2d 369) (2009).

dioxide, and talc (collectively, "filler") from waste paper. The filler, short fibers, and water all flow into a treatment plant where the solids settle and become sludge.

In order to ensure that this process complies with requirements of the Georgia Environmental Protection Division, which issued various permits for the Mill, GP adds bacteria to the sludge to reduce the amount of oxygen and sulfates in the sludge. During this process, hydrogen sulfide is created and ultimately released from the sludge. Hydrogen sulfide is a flammable, colorless gas that smells like rotten eggs. Hydrogen sulfide occurs both naturally in the atmosphere and from human-made processes, including the landfill and paper operations. The creation of hydrogen sulfide is a natural, essential, and unavoidable part of the recycled paper making process.

Although hydrogen sulfide can be extremely toxic if there is a large quantity in a confined space, the United States Environmental Protection Agency does not consider it a hazardous air pollutant. In addition, the State of Georgia has not established air quality limits for hydrogen sulfide. As a result, the amount of hydrogen sulfide emitted by the Mill is not regulated by any of GP's environmental permits.

The Plaintiffs' homes were built in the early 2000's after being approved for development by the County Commission in Mallard Pointe, a subdivision which is and always has been located across the street from the Mill's sludge disposal cells. There are approximately 20 homes in the subdivision.

In 2006 and 2007 GP first became aware of complaints of HVAC failures. Specifically, the Plaintiffs have allegedly experienced problems with the hydrogen sulfide's foul odor, as well as corrosion of metal components in HVAC units, external and internal metal fixtures of their homes, main panel components, copper piping, and smoke detectors inside their homes. The Plaintiffs' expert opined that no other source of hydrogen sulfide was likely in Mallard Pointe, and therefore, the Mill was emitting concentrations of hydrogen sulfide sufficient to cause corrosion in the Plaintiffs' homes and HVAC units.

In response to the complaints from Mallard Pointe residents, GP undertook numerous efforts to remediate the emissions, including replacing damaged HVAC units, but those efforts did not eliminate the problem. GP now pays to have the sludge removed from the Mill and beneficially reused for farming purposes.

1. In Case No. A17A1969, GP contends that it was entitled to summary judgment on the Plaintiffs' nuisance claim because it is immune from nuisance liability under Georgia's "right to farm" statute, OCGA § 41-1-7. We agree.

Even though the Plaintiffs moved across the street from a pre-existing recycled paper mill, the defense of "coming to the nuisance" is generally not recognized in this state as a complete bar to bringing a claim.[3] Nevertheless, Georgia, like all other states, has a statute, colloquially referred to as the "right to farm" statute, which codifies a "coming to the nuisance" defense in certain circumstances. This statute is in derogation of the common law, and thus it must be strictly construed.[4]

(*a*) *Whether the Mill meets the definitions contained in the right to farm statute*.

Codified at OCGA § 41-1-7, Georgia's "right to farm" statute was passed because it is the legislature's

> declared policy of the state to conserve, protect, and encourage the development and improvement of its agricultural and forest land and facilities for the production or distribution of food and other agricultural products, including without limitation forest products. When nonagricultural land uses extend into agricultural or

---

[3] See *Savannah & W.R. Co. v. Woodruff*, 86 Ga. 94, 99 (3) (13 SE 156) (1890).

[4] See *Heard v. Neighbor Newspapers, Inc.*, 259 Ga. 458 (5) (b) (383 SE2d 553) (1989).

6

agriculture-supporting industrial or commercial areas or forest land or when there are changed conditions in or around the locality of an agricultural facility or agricultural support facility, such operations often become the subject of nuisance actions. As a result, such facilities are sometimes forced to cease operations. Many others are discouraged from making investments in agricultural support facilities or farm improvements or adopting new related technology or methods. It is the purpose of this Code section to reduce losses of the state's agricultural and forest land resources by limiting the circumstances under which agricultural facilities and operations or agricultural support facilities may be deemed to be a nuisance.[5]

So as to effectuate this stated policy, the statute provides that

*[n]o . . . agricultural support facility*, *or any operation at an agricultural support facility shall be or shall become a nuisance*, either public or private, as a result of changed conditions in or around the locality of such facility or operation if the facility or operation has been in operation for one year or more. The provisions of this subsection shall not apply when a nuisance results from the negligent, improper, or illegal operation of any such facility or operation.[6]

As is relevant to this case, the term "agricultural support facility" is defined as "any food processing plant *or forest products processing plant together with all*

---

[5] OCGA § 41-1-7 (a).

[6] (Emphasis supplied.) OCGA § 41-1-7 (c).

*related or ancillary activities. . . .*[7] The statute further defines "forest products processing plant" as "a commercial operation that manufactures, packages, labels, distributes, or stores any *forest product . . . .*"[8] The term "forest product" is not defined by statute. Consequently, we must determine in the first instance whether recycled paper is a "forest product" as contemplated by the statute to determine if the Mill constitutes a "forest products processing plant" that is part of an "agricultural support facility" that is immune from nuisance liability under the "right to farm" statute.

"We consider questions of statutory construction under a de novo standard of review."[9]

> In construing a statute, our goal is to determine its legislative purpose. In this regard, a court must first focus on the statute's text. In order to discern the meaning of the words of a statute, the reader must look at the context in which the statute was written, remembering at all times that the meaning of a sentence may be more than that of the separate words, as a melody is more than the notes. If the words of a statute, however,

---

[7] (Emphasis supplied.) OCGA § 41-1-7 (b) (3.1).

[8] (Emphasis supplied.) OCGA § 41-1-7 (b) (4.2).

[9] (Citation omitted.) *Jackson v. Sanders*, 299 Ga. 332, 334 (788 SE2d 387) (2016).

are plain and capable of having but one meaning, and do not produce any absurd, impractical, or contradictory results, then this Court is bound to follow the meaning of those words. If, on the other hand, the words of the statute are ambiguous, then this Court must construe the statute, keeping in mind the purpose of the statute and the old law, the evil, and the remedy.[10]

Further, "[i]n all interpretations of statutes, the ordinary signification shall be applied to all words, except words of art or words connected with a particular trade or subject matter, which shall have the signification attached to them by experts in such trade or with reference to such subject matter."[11]

Here, the term "forest product" is not defined by the statute, but the definition of this term is crucial to determining whether the Mill's operations fall under the protections of the "right to farm" statute. This Court cannot ascertain the definition of that term, however, solely by looking at the text of the statute. Even considering "forest product" to be a term of art is insufficient to end this Court's inquiry because

---

[10] (Citations, punctuation, and footnotes omitted.) *Busch v. State*, 271 Ga. 591, 592 (523 SE2d 21) (1999); see also *City of Atlanta v. City of College Park*, 292 Ga. 741, 744 (741 SE2d 147) (2013) (when a term is undefined in a statute, "the cardinal rule is to glean the intent of the legislature") (citation omitted).

[11] OCGA § 1-3-1 (b).

9

the forestry industry's classification of waste paper and recycled paper operations does not align cleanly with the language of the statute.

The Georgia Forestry Commission ("GFC") recognized the diversity of the forestry industry and stated: "[a] general definition would include all service and manufacturing activity related to the growth, harvesting, and use of forest materials that would not exist in Georgia without the presence of extensive forests or forest industries. For example, the papermaking industry would be a part of the forestry industry definition, but retail sales of that paper would not."[12] The GFC further specified that the paper products sector would fit within the definition.[13] Fitting with this approach, the GFC has broadly referenced a different recycled paper mill as being part of the "forest products industry."

Some other organizations simply classify recycled paper and waste paper as "forestry products." In the "Classification and definitions of forest products" supplement issued by the Food and Agriculture Organization of the United Nations, for instance, "paper and paperboard" and "waste paper," including converted paper,

---

[12] 2015 Economic Benefits of the Forestry Industry in Georgia (http://www.gfc.state.ga.us/utilization/economic-impacts/2015%20Economic%20 Benefits%20Report%20FINAL.pdf) (pg. 9).

[13] See id.

10

are considered types of forest products. Further, the United States Department of Agriculture considers recycled paper manufacturing to be part of the forest industry and notes that recycling "creates value-added products to the forest economy and primary manufacturing industries."

Not all organizations are so clear. A report prepared for the GFC by the Economic Development Institute of Georgia Tech characterized the paper-making industry as part of the forestry industry, but does not specify if it includes recycled paper-making in that definition. In addition to the above referenced definition, the GFC has also separately designated primary wood-using industries and secondary wood-using industries, and categorizes the Mill as a secondary wood-using industry. The Southern Group of State Foresters uses this designation as well. . Additionally, the United Nations Economic Commission for Europe defines "waste paper" as a forest product, but considers it to be its own separate group. The statute, however, by its express terms, does not differentiate between primary and secondary forest products, nor does it reference waste paper.

These sources make clear that the term, which is not defined by the statute, is not a word of art which is universally and consistently defined by the industry. We thus find that the term "forest product" is ambiguous in the statute. Our role is then

11

to glean the intent of the legislature by keeping in mind the purpose of the "right to farm" statute and the old law, the evil, and the remedy.[14]

Here, the purpose of the legislation is explicitly stated in the statute: "to conserve, protect, and encourage the development and improvement of [the State's] agricultural and forest land and facilities for the production or distribution of food and other agricultural products, including without limitation forest products" by "limiting the circumstances under which agricultural facilities and operations or agricultural support facilities may be deemed to be a nuisance."[15] We find that even under a narrow construction of the statute, protecting a facility such as the Mill from nuisance liability by finding that it is a "forest products processing plant" squarely aligns with the purpose of the "right to farm" statute. This is because encouraging recycling conserves forest land and enables continued development of additional markets for distributing products made from wood fibers.[16] Stated otherwise,

---

[14] *Busch*, supra, 271 Ga. at 592; see also *City of Atlanta*, supra, 292 Ga. at 744.

[15] OCGA § 41-1-7 (a).

[16] The trial court's order focused on the fact that the pulp and waste paper used by the Mill may not have come from Georgia. OCGA § 1-3-3 (4.1), however, defines "'[a]griculture,' 'agricultural operations,' or 'agricultural or farm products'" as used in the Official Code of Georgia and states that "[a]gricultural or farm products are considered grown in this [S]tate if such products are grown, produced, or processed

12

recycling extends the useful life of wood fibers, which has both economic and conservation benefits that advance the stated purpose of the "right to farm" statute. Thus, the Mill falls under the statute and is protected from nuisance liability. This conclusion also protects the ancillary sludge disposal cells at issue in this litigation because the disposal process is an ancillary activity of the Mill.[17] The trial court's interpretation would essentially ignore the legislature's amendment of the statute to add forest products and our rules of statutory construction do not allow us to disregard statutory language.[18]

---

in this [S]tate, whether or not such products are composed of constituent products grown or produced outside this [S]tate." Moreover, to interpret the right to farm statute in a way which only provided protection for facilities which used exclusively Georgia products would likely constitute protectionism in violation of the dormant commerce clause. See *C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 390 (114 SCt 1677, 128 L Ed 2d 399) (1994) (Recognizing that the rationale of the dormant commerce clause is to "prohibit state or municipal laws whose object is local economic protectionism" and which "discriminate against an article of commerce by reason of its origin . . ."). As an appellate court, we have a duty to construe statutes in a manner which upholds them as constitutional whenever possible, and therefore, we will not interpret the statute in a way which could be unconstitutionally protectionist. See *Cobb County School Dist. v. Barker*, 271 Ga. 35, 37 (1) (518 SE2d 126) (1999).

[17] See OCGA § 41-1-7 (b) (3.1).

[18] *Expedia, Inc. v. City of Columbus*, 285 Ga. 684, 689 (4) (681 SE2d 122) (2009) ("A statute must be construed to give sensible and intelligent effect to all of its provisions and to refrain from any interpretation which renders any part of the

13

The Plaintiffs argue that our decision in *Roberts v. S. Wood Piedmont Co.*,[19] precludes this interpretation of the statute because in that case this Court found that a facility that manufactured utility logs was not covered by the statute. *Roberts*, however, was decided prior to amendments to the right to farm statute. Those amendments undoubtedly expanded the statute to encompass the forestry industry.[20]

*(b) Whether the Mill is operated in a way that exempts it from the protection of the statute.*

A facility which otherwise meets the definitions of the statute can, nonetheless, be excluded from its protection under certain circumstances. The statute specifically provides that "[t]he provisions of this subsection shall not apply when a nuisance results from the negligent, improper, or illegal operation of any such facility or

---

statute meaningless.") (citation and punctuation omitted).

[19] 173 Ga. App. 757 (328 SE2d 391) (1985).

[20] The Plaintiffs are correct that the *Roberts* opinion has been cited subsequent to the revision to the right to farm statute in the case of *Alexander v. Hulsey Envtl. Servs., Inc.*, 306 Ga. App. 459, 463 (4) (702 SE2d 435) (2010). This citation, however, did not revive a holding that has since been superceded by amendment to a statute. In *Alexander*, a facility which received septage and grease for storage and treatment was not covered by the right to farm statute. See id. That facility was unrelated to any agricultural or forestry operation, however, so the case is inapposite to the current facts.

14

operation."[21] It is undisputed that the Mill is not being operated illegally, thus, the only question is whether it is being operated negligently or improperly.

"It is well established that to recover for injuries caused by another's negligence, a plaintiff must show four elements: a duty, a breach of that duty, causation and damages."[22] The Plaintiffs allege that the Mill is being operated negligently because it is emitting hydrogen sulfide, which is damaging their property. We disagree. Our thorough review of the record shows that the Plaintiffs failed to demonstrate that the Mill is being operated negligently or improperly.

All witnesses in the case agree that there are no permits that regulate GP's emission of hydrogen sulfide gas into the ambient air, thus, it is undisputed that GP is not in violation of any duty created by a permit or environmental regulation. Moreover, the record reflects that GP undertook, at its own expense, numerous efforts to remediate the hydrogen sulfide emission.[23] GP's expert opined that there was

---

[21] OCGA § 41-1-7 (c).

[22] (Citation omitted.) *Goldstein, Garber & Salama, LLC v. J.B.*, 300 Ga. 840, 841(1) (797 SE2d 87) (2017).

[23] This included a program to replace damaged HVAC units ; providing monitors for hydrogen sulfide levels; installing an odor abatement spray system ; installing local solar flares into the sludge cells to improve the drainage ; dispersing an oil-based plant chemical into the sludge cells to encapsulate the hydrogen sulfide

15

nothing further that GP could have done to remediate the problems experienced by the Plaintiffs, that GP went beyond what it was required to do to reasonably operate the Mill, and that it was operated pursuant to industry standards.

Citing *Weller v. Blake*, the Plaintiffs contend, however, that GP has violated the general duty owed to the world not to subject them to unreasonable risk of harm.[24] In *Weller*, this Court found a jury issue existed as to the question of the breach of this general duty when smoke from one homeowner's properly constructed backyard fireplace blew smoke into their neighbor's home.[25] *Weller*, however, is distinguishable from the present cases. *Weller* involved the subsequent installation of an outdoor fireplace, an addition which is not necessary for a home to function. Conversely, here, it is undisputed that the sludge necessarily created by the recycled paper manufacturing process naturally releases hydrogen sulfide gas. Consequently,

---

molecules ; hiring a company to observe the air flow and the movement of air near the cells through observations of smoke patterns ; conducting an Odor Control Alternatives Evaluation to seek ways to address the offsite impact of the odors from hydrogen sulfide ; separating out two different types of sludge ; using more effective compounds to reduce the sulfur production ; and ultimately closing all of the sludge disposal cells by finding ways to beneficially reuse the waste from the Mill. .

[24] 315 Ga. App. 214, 219 (2) (726 SE2d 698) (2012).

[25] See id. at 215-216, 219 (2).

a homeowner's use of a non-essential outdoor addition is not analogous to the Mill's unavoidable creation of sludge which releases hydrogen sulfide.

Given that the Plaintiffs have shown no rule, regulation, or standard that GP has violated, we cannot say that they are being subjected to an *unreasonable* risk of harm. Although "coming to the nuisance" is not a complete bar to the Plaintiffs' claims under the common law, when analyzing the reasonableness of the harm, it is not irrelevant that the Plaintiffs moved across the street from a pre-existing recycled paper mill facility. In the absence of evidence that the Mill is being operated in a way which *unreasonably* subjects the Plaintiffs to a risk of harm, we cannot find that the Mill is being operated negligently or improperly. This is particularly true in the face of undisputed evidence that GP undertook numerous efforts to attempt to minimize the risk of harm to the Plaintiffs.

In response to GP's evidence that the Mill was being properly operated, the Plaintiffs point to their complaints of harm without offering evidence to support that this was the result of unreasonable, negligent, or improper conduct by GP, rather than this being merely the result of moving across the street from a pre-existing paper

mill.[26] The Plaintiffs argue that GP could have adopted the process of removing the sludge from the Mill sooner, but it provided no evidence that this was the only appropriate or reasonable way to comply with any standard.

As we cannot say that the Mill is being operated negligently, illegally, or improperly, the exemption in OCGA § 41-1-7 (c) does not apply and the Mill is protected from nuisance liability under the statute. Consequently, we conclude GP was entitled to summary judgment on the Plaintiffs' nuisance claim. We therefore reverse the trial court's denial of summary judgment to GP on the Plaintiffs' nuisance claim and its grant of partial summary judgment to the Plaintiffs.

2. In Case No. A17A1969, GP next contends that Plaintiffs have failed to establish the necessary elements for a negligence claim. We agree.

For the reasons discussed above in Division 1 (b), we find that the Plaintiffs have not met their burden to establish that GP's operation of the Mill breached a duty

---

[26] See OCGA § 9-11-56 (e) ("When a motion for summary judgment is made and supported as provided in this Code section, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this Code section, must set forth specific facts showing that there is a genuine issue for trial."). GP contends that the Plaintiffs failed to provide necessary *expert* testimony to establish the duty it owed. We need not decide whether expert testimony was required here, however, because the Plaintiffs failed to produce *any* evidence to support their claim that GP breached a duty by exposing them to unreasonable risk of harm.

18

owed to them. Accordingly, we reverse the trial court's denial of GP's motion for summary judgment on the Plaintiffs' negligence claim.

3. In Case No. A17A1970, the Plaintiffs contend that the trial court erred by granting summary judgment to GP on their trespass claim. We disagree.

Trespass is defined by the Code to mean any "misfeasance, transgression, or offense which damages another's health, reputation, or property."[27] OCGA § 51-9-1 affords parties a cause of action for interference with the enjoyment of their property when the act of another "unlawfully interferes with such enjoyment." As set forth in Divisions 1 and 2, GP has not acted unlawfully in the operation of its manufacturing plant. As such, there can be no trespass.

Interpreting the statutory language set forth above, the Georgia Supreme Court and this Court have discussed the distinction between a nuisance and a trespass:

> [a]s a general rule, a trespass is a wrongful interference with a right to exclusive use and benefit of a property right. Nuisance is anything that causes hurt, inconvenience, or damage to another's person or property. Thus, a trespass generally involves a *wrongful act* that interferes with an owner's right to the exclusive use and enjoyment of his property. A

---

[27] OCGA § 1-3-3 (20).

19

nuisance, on the other hand, may result from an act that is itself legal, but which nevertheless causes damage to the property of another.[28]

"[T]he distinction between trespass and nuisance [is] that trespass is a *direct* infringement of one's right of property, while in the case of a nuisance the infringement is the result of an act which is not wrongful in itself but only because of the consequences which flow from it."[29]

Here, GP's operation of its manufacturing plant is not unlawful in and of itself; rather, the consequence of its operation is that hydrogen sulfide is created from the normal decomposition of sludge discarded into the plant's on-site landfill. When the hydrogen sulfide mixes with moisture in the air (and if the wind blows it in the direction of the Plaintiffs' property), it allegedly corrodes the metal components in HVAC units, metal fixtures, main panel components, copper piping, and smoke detectors.

---

[28] (Citations and punctuation omitted; emphasis supplied.) *Petree v. Ga. Dept. of Transp.*, 340 Ga. App. 694, 702 (798 SE2d 482) (2017) (physical precedent only), citing *J. D. Jewell, Inc. v. Hancock*, 226 Ga. 480, 483 (2) (175 SE2d 847) (1970), *Rinzler v. Folsom*, 209 Ga. 549, 552 (2) (74 SE2d 661) (1953), *Bishop Eddie Long Ministries v. Dillard*, 272 Ga. App. 894, 901 (3) (613 SE2d 673) (2005).

[29] (Emphasis supplied.) *Rinzler*, 209 Ga. at 552 (2).

This is a classic claim for nuisance, which is foreclosed by statute as determined in Division 1. GP's operation of its plant — the act in question — is lawful, and there is no evidence that GP is taking any direct action[30] to send hydrogen sulfide onto the Plaintiffs' property. Thus, there is no direct infringement on the Plaintiffs' property. Rather, any relevant injuries to the Plaintiffs are the consequences that flow from an act that is not wrongful in and of itself, i.e., a nuisance and not a trespass. Accordingly, we affirm the trial court's grant of summary judgment to GP as to the Plaintiffs' trespass claim.

4. In Case No. A17A1970, GP contends that the trial court erred by denying its motion for summary judgment on the Plaintiffs' claims for attorney fees and punitive damages. Based on our holdings in Divisions 1-3 in which we determined that GP was entitled to summary judgment as to each of the Plaintiffs' substantive claims, we

---

[30] The dissent relies on *Merlino v. City of Atlanta*, 283 Ga.186, 189 (657 SE2d 859) (2008) to support its finding that a question of fact exists on the trespass claim and that an act of trespass can originate solely within the boundaries of one property if it affects another property. But in *Merlino*, the question of fact was whether the act of one neighbor of plugging an underground sewage pipe located on their own property was wrongful in light of evidence that the neighbor who plugged the pipe knew it would cause water to back up and flood the Merlinos' property. There is no question of fact in this case that the act — the operation of the plant — was not wrongful. Thus, as set forth above, any claim that the Plaintiffs may have had lies in nuisance, not trespass.

reverse the trial court's denial of summary judgment to GP as to these derivative claims.[31]

*Judgment affirmed in Case No. A17A1970 and reversed in Case No. A17A1969. Reese, J., concurs. Miller, P. J., concurs as to Divisions 1 and 2 and dissents as to Divisions 3 and 4.*

**\*DIVISIONS 3 AND 4 OF THIS OPINION ARE PHYSICAL PRECEDENT ONLY. COURT OF APPEALS RULE 33.2(a).**

---

[31] See, e.g., *D. G. Jenkins Homes, Inc. v. Wood*, 261 Ga. App. 322, 325-326 (3) (582 SE2d 478) (2003). Compare with *Kahn v. Britt*, 330 Ga. App. 377, 392-393 (8) (765 SE2d 446) (2014).

A17A1969, A17A1970.    GEORGIA PACIFIC CONSUMER MI-XXX

PRODUCTS, LP v. RATNER, et al.; and vice versa.           MI-XXX

MILLER, Presiding Judge, dissenting in part.

I concur fully with all that is said in Divisions 1 and 2 of the majority opinion. I must respectfully dissent to Divisions 3 and 4, however, because I am constrained to conclude that, under the statutory language of OCGA § 51-9-1, the Plaintiffs have proffered sufficient evidence to survive summary judgment on their claim for trespass.

"The right of enjoyment of private property being an absolute right of every citizen, every act of another which unlawfully interferes with such enjoyment is a tort for which an action shall lie." OCGA § 51-9-1. The plain language of the statute says

"unlawful interference" not "unlawful act." See OCGA § 51-9-1. Thus, as is clear from the statutory language, the focus of a trespass claim is whether the voluntary conduct of one party "unlawfully interferes" with another's possessory interest in land. In other words, it is the very act of entering upon another's property that is itself wrongful, even if the underlying action causing the interference is committed totally free from negligence.[1]

Although the majority focuses on the propriety of the manner in which the Mill is operated, and the Plaintiffs' obvious choice to move across the street from the pre-existing Mill, so as to bar Plaintiffs' trespass claim, this, however, does not comport with the plain language of the statute. See OCGA § 51-9-1. Moreover, our Court has explained that "under Georgia law, a trespasser is one who, though *peacefully or by mistake*, wrongfully enters upon property owned or occupied by another." (Citation omitted; emphasis supplied.) *Tacon v. Equity One, Inc.*, 280 Ga. App. 183, 185 (633 SE2d 599) (2006). "Liability for a trespass upon real property produced by a voluntary act is absolute and does not have to be grounded in negligence, so long as the act causing the trespass was intended." (Citation omitted.) Id. at 188 (2). Thus, it

---

[1] *Merlino v. City of Atlanta*, 283 Ga. 186, 190 (3) (657 SE2d 859) (2008) (recognizing that an action can constitute a trespass when it initiates solely within the boundaries of one property and affects another property).

2

is of no consequence that the unlawful interference arose from GP's non-negligent activity.

I agree with the majority that Plaintiffs have alleged a classic nuisance claim - one which could survive summary judgment but for the statutory bar. The claims of nuisance and trespass, however, are not mutually exclusive, and the same conduct can give rise to both claims. *Brand v. Montega Corp.*, 233 Ga. 32, 33 (1) (209 SE2d 581) (1974) ("As we read the allegations and the evidence in this case, the alleged acts of trespass and the alleged acts of nuisance were one and the same."); *Shaheen v. G & G Corp.*, 230 Ga. 646, 648 (2) (198 SE2d 853) (1973) (finding that the evidence submitted would support a finding of a continuing trespass and a continuing nuisance in a surface-water invasion case). Here, the Plaintiffs' evidence is sufficient to establish a factual dispute as to whether GP's sludge pits - and their release of hydrogen sulfide gas and resulting sulfuric acid - "unlawfully interferes" with the use and enjoyment of the Plaintiffs' property. See OCGA § 51-9-1; *Merlino*, supra, 283 Ga. at 190 (3). That is all that is required for a trespass claim to survive summary judgment. See OCGA § 51-9-1; *Tacon*, supra, 280 Ga. App. at 188 (2).

For these reasons, I would reverse the trial court's grant of summary judgment to GP on Plaintiffs' trespass claim and remand the case for this issue to be decided

3

by a jury. If, and only if, a jury found Plaintiffs' trespass claim meritorious, could Plaintiffs pursue punitive damages and attorney fees. See *Tookes v. Murray*, 297 Ga. App. 765, 768 (2) (678 SE2d 209) (2009) (the determination of whether a tort was sufficiently aggravating to authorize punitive damages is generally a jury question); *Tyler v. Lincoln*, 272 Ga. 118, 121 (2) (527 SE2d 180) (2000) (recognizing that the failure to ameliorate a continuing trespass authorizes the jury to consider the facts and circumstances of the case and award attorney fees pursuant to OCGA § 13-6-11 when appropriate).